UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TARGUS INTERNATIONAL COMPANY,
    a Florida Corporation, and
ARMOR SCREEN CORPORATION,
    a Florida corporation,

    Plaintiffs,

vs.

STORM CATCHER, INC.,
    a Florida corporation;
TROPICAL STORM SHIELD, INC.,
    a Florida corporation;
STORM SMART BUILDING SYSTEMS, INC.;
    a Florida corporation;
POSITIVE IMPROVEMENTS, INC.;
    a Florida corporation;
M&R PRODUCTS, INC.;
    a Florida corporation;
SMART TRACKS, INC.;
    a Florida corporation;
21ST CENTURY SCREENS, INC.;
    a Florida corporation;
SAVANNAH TRIMS, INC.;
    a Florida corporation;
BRIAN RIST, an individual;
STEPHEN JOHNSON, an individual;
WES FRASER, an individual;
DENNIS DUDASH, an individual; and
BARBARA DUDASH, an individual

    Defendants.

_____/

NIGHT BOX
FILED

MAR 31 2006

CLARENCE MADDOX
DESK, USDC / SDFL / MIA

06 - 80303

CIV-RYSKAMP

MAGISTRATE JUDGE
VITUNAC

## COMPLAINT FOR PATENT INFRINGEMENT, BREACH OF AGREEMENT AND UNFAIR COMPETITION

The Plaintiffs, TARGUS INTERNATIONAL, INC. and ARMOR SCREEN, INC., sue the

Defendants, STORM CATCHER, INC.; TROPICAL STORM SHIELD, INC.; STORM SMART

BUILDING SYSTEMS, INC.; POSITIVE IMPROVEMENTS, INC.; M&R PRODUCTS, INC.;

SMART TRACKS, INC.; 21ST CENTURY SCREENS, INC.; SAVANNAH TRIMS, INC.; BRIAN

RIST; STEPHEN JOHNSON; WES FRASER;  DENNIS DUDASH; and BARBARA DUDASH

for Patent Infringement, Breach of Agreement, and Unfair Competition, and complain as follows:

## JURISDICTION AND VENUE

1.     This court has subject matter jurisdiction of this cause, pursuant to 28 U.S.C. §

1338(a), and the Patent Laws of the United States, 35 U.S.C. § 271, et. seq.  This court has

supplemental jurisdiction as to the related state law claims  for Breach of Agreement and Unfair

Competition, pursuant to 28 U.S.C. § 1367.

2.     This court has personal jurisdiction over the Defendants by virtue of F.S. 48.193(1)

and (2), in that the Defendants are doing business in the State of Florida, and have committed

tortious acts within the State of Florida.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1400(b), and 28 U.S.C. §

1367.

## THE PARTIES

4.     TARGUS INTERNATIONAL COMPANY, is a Florida corporation, located in Palm

Beach Gardens, Florida.  It is the owner of various U.S. Patents directed to storm protection devices

and methods, including the patents which are the subjects of this action, attached hereto as Exhibits

"A", "B", and "C".

5.     ARMOR SCREEN CORPORATION is a Florida corporation having its principal

place of business at 2001-A North Congress Avenue, Riviera Beach, Florida.  It is in the business

of manufacturing, selling, promoting, and installing hurricane protection systems, employing the

2

patented methods and devices as further described within. It is the sole licensee of the three patents in suit, and maintains a substantial dealer network as part of its efforts toward commercializing the inventions disclosed in those patents.

6.     STORM CATCHER, INC., is a Florida corporation with its principal place of business located at 6182 Idlewild Street, Fort Myers, Florida. It is in the business of promoting and selling a wind abatement system known as the "STORM CATCHER". (It may also be marketed under the name "STORM PROTECTOR" in certain sectors as to which the Plaintiffs require discovery.) This company is controlled by individual Defendants, BRIAN RIST and STEPHEN JOHNSON who are its sole officers and directors.

The corporations identified in Paragraphs 7, 8, 9, 10 and 11 below, are, upon belief, part of a constellation of related entities directed to, among other things, manufacturing, promoting, selling, and installing the "STORM CATCHER". These businesses are controlled and owned by RIST and JOHNSON, and, upon belief, their wives Kim Rist and Kathleen Johnson.

The Plaintiffs are presently uncertain as to the exact nature and scope of the relationships, connections and activities of these business entities, aside from their participation in the scheme of patent infringement recited in this Complaint. The Plaintiffs require discovery to ascertain the full extent and nature of the relationships between the corporations, and the individuals who control them, so that an Amended Complaint may more thoroughly and correctly identify and correlate the entities and individuals.

7.     TROPICAL STORM SHIELD, INC., is a Florida corporation having its principal place of business at 1748 Independence Boulevard, F-5, Sarasota, Florida.   It is controlled by Defendant, STEPHEN JOHNSON, and his wife, Kathleen Johnson. The company is a former

3

dealer of the Plaintiff, ARMOR SCREEN CORPORATION, and entered into a restrictive covenant to obtain benefits from ARMOR SCREEN CORPORATION. Its current activities and relationship to the other corporate Defendants require further discovery.

8.     STORM SMART BUILDING SYSTEMS, INC. is a Florida corporation with its principal place of business at 6182 Idlewild Street, Ft. Myers, Florida.   Its principal officer is BRIAN RIST, and upon belief, participates with one or more of the corporate and individual Defendants in the sale and installation of the infringing wind abatement systems described further within.   Additional discovery is needed to ascertain the exact activities of the company.

9.     POSITIVE IMPROVEMENTS, INC. is a Florida corporation with its principal place of business at 6213 Idlewild Street, Ft. Myers, Florida.  Its sole officer and director is BRIAN RIST. The company owns a plant located at 6182 Idlewild Street, Ft. Myers, Florida, and upon belief, manufactures components of the infringing "STORM CATCHER" system and facilitates the infringing activities of all other Defendants.  It has applied for trademark protection related to the infringing products and services of the Defendants. Further discovery is needed to ascertain its exact activities.

10.     M&R PRODUCTS, INC. is a Florida corporation with its principal place of business at 6182 Idlewild Street, Ft. Myers, Florida.  Individual Defendant, BRIAN RIST, is the president, treasurer, and director of the corporation.   Upon belief, this company submitted applications for product approval of the "STORM CATCHER" system, and its activities are believed to facilitate and support the scheme of infringement recited herein.  Further discovery is needed to ascertain its exact activities in relationship to all other Defendants.

4

11.     SMART TRACKS, INC. is a Florida corporation with its principal place of business at 6213 Idlewild Street, Ft. Myers, Florida. The company is controlled by individual Defendant, BRIAN RIST, and his wife, Kim Rist. Upon belief, the company participates in the scheme of infringement recited herein. Additional discovery is required to ascertain the exact activities of the company and its relationship to all other Defendants.

12.     BRIAN RIST is, upon belief, a resident of Lee County, Florida, and controls a number of the corporations named above, which are actively engaged in the infringement of the Plaintiffs' patents and overall scheme of unfair competition. In his capacity as principal decision maker/owner of the various entities, RIST is actively and intentionally directing the scheme of patent infringement recited herein.

In or before the year 2002, BRIAN RIST, conspired with STEPHEN JOHNSON, in beginning preparations to obtain valuable knowledge of ARMOR SCREEN's business and innovative technology, in violation of ARMOR SCREEN'S rights, and continues such activities today in direct competition with ARMOR SCREEN.

13.     STEPHEN JOHNSON is, upon belief, a resident of Sarasota County, Florida. Through his company, TROPICAL STORM SHIELD, INC., he was formerly a dealer for ARMOR SCREEN. JOHNSON in conspiracy with Kathleen Johnson, caused TROPICAL STORM SHIELD to breach it's agreement not to compete with ARMOR SCREEN and conspired with BRIAN RIST to unfairly compete against ARMOR SCREEN, including knowing infringement of its patented technology. JOHNSON is a principal decision maker/owner of the various entities recited above, and is actively and intentionally directing the scheme of patent infringement recited herein.

5

14.    RIST and JOHNSON have directly controlled the willful infringement of TARGUS INTERNATIONAL'S patented technology as further described below.    Upon belief, the corporations named in Paragraphs 6-11 are the alter ego of RIST and JOHNSON and vice-versa.

15.    21ST CENTURY SCREENS, INC. is a Florida corporation with its principal place of business at 1599 S.W. 30th Avenue, Suite 5, Boynton Beach, Florida. The company is a significant "STORM CATCHER" dealer. It was previously a dealer for the Plaintiff, ARMOR SCREEN by virtue of an agreement dated July 18, 2001. The Plaintiffs also require discovery to determine if it is selling infringing systems under names other than STORM CATCHER.

16.    WES FRASER is, upon belief, a resident of Palm Beach County, Florida, and is the principal officer and director of the Defendant, 21ST CENTURY SCREENS, INC.  Upon belief, he has conspired with RIST and JOHNSON, and the companies they control to infringe the patents in suit and unfairly compete with ARMOR SCREEN through the promotion, sale and installation of the infringing STORM CATCHER.

17.    SAVANNAH TRIMS, INC. is a Florida corporation which is presently a dealer for ARMOR SCREEN, but is instead promoting and selling STORM CATCHER in violation of its Dealer Agreement, in conspiracy with  BRIAN RIST, STEPHEN JOHNSON, and the companies they control.

18.    DENNIS DUDASH is, upon belief, a resident of Palm Beach County, Florida, and operates and controls SAVANNAH TRIMS, INC. The company is obligated by a Dealer Agreement with ARMOR SCREEN, but is instead promoting and selling  the STORM CATCHER system in violation of that agreement, and the patent rights of the Plaintiffs.

6

19.     BARBARA DUDASH is, upon belief, a resident of Palm Beach County, Florida, and operates and controls SAVANNAH TRIMS, INC. as the president of the corporation and the wife of individual Defendant, DENNIS DUDASH.  In this capacity, she has conspired with DENNIS DUDASH, RIST, and JOHNSON to  breach the agreement between SAVANNAH TRIMS, INC. and ARMOR SCREEN, as well as infringing the patents in suit as part of a plan of unfair competition against ARMOR SCREEN.

## BACKGROUND

20.     The patents in suit claim a flexible, lightweight hurricane protection system designed to secure property against impact by foreign objects during hurricanes, and other high wind environments.    Over approximately ten years,  ARMOR SCREEN, has tested and installed numerous systems employing this technology, which comprises a fundamentally different method of protection against hurricanes.  Usually embodying a flexible textile material, it provides significant benefits over previously known art in the field which consists of rigid types of protection, and it has met with significant market acceptance.  This technology also reduces wind pressure and water damage from driven  rain; its transparent nature also permits the entry of light to protected structures.

21.     The quality and success of ARMOR SCREEN'S technology has been acknowledged through great success in the market place, as well as the highest recognition of the effectiveness of the system.   For example, ARMOR SCREEN'S system has been nominated for the Florida Governor's Award for Innovation in Technology and has achieved certification by Miami-Dade County, which maintains the most rigorous standards in the U.S. The county actually instituted a new category of storm protection system as a result of the novel methods of hurricane protection

7

provided by ARMOR SCREEN'S system. The superiority and effectiveness of the ARMOR SCREEN system was dramatically demonstrated during the 2004 hurricane season, when the State of Florida was impacted by four major hurricanes.

22.     ARMOR SCREEN has commercialized this technology, and built its business in large measure through its network of dealers. A requirement of most of its Dealer Agreements includes the protection of confidential information, and a period of non-competition consistent with Florida law, both during the term of the Dealer Agreement and for a twenty-four month period thereafter.

23.     In August of 2001, STEPHEN JOHNSON, sought a dealership with ARMOR SCREEN CORPORATION, through his company, TROPICAL STORM SHIELD, INC. The company entered into a Dealer Agreement with ARMOR SCREEN through Kathleen Johnson, an officer of the company and the wife of STEPHEN JOHNSON.

24.     After obtaining information regarding the workings of the ARMOR SCREEN system and valuable attendant commercial information, STEPHEN JOHNSON and Kathleen Johnson employed the system in competition with ARMOR SCREEN, as part of a conspiracy of unfair competition, with Defendant, BRIAN RIST. Upon belief, in the year 2002, JOHNSON and RIST, and STORM SMART BUILDING SYSTEMS, INC., surreptitiously obtained the ARMOR SCREEN system through Rollsafe International, a dealer for ARMOR SCREEN, and ultimately installed the system at a school in order to gain additional information and experience for competing against ARMOR SCREEN.

25.     JOHNSON and RIST subsequently exploited additional information gained through ARMOR SCREEN.   Part of their efforts to unfairly compete involved contacting ARMOR SCREEN dealers for the purpose of enticing them to market the STORM CATCHER product, in

contravention of Dealer Agreements.

26.     The Defendants are inducing and seeking to induce ARMOR SCREEN dealers to violate their Dealer Agreements by also purchasing STORM CATCHER.  Statements have been made by one or more of the Defendants that: "We do not require our dealers to sign an agreement, and all sales are confidential so you do not have to worry about being stuck to a contract should you ever feel the need to move on."   Such statements are directed to providing a comfort level to ARMOR SCREEN dealers, otherwise bound by their Dealer Agreement, to deal in a competing lower cost product.

27.     After gaining extensive knowledge of ARMOR SCREEN'S experience and technology, the Defendants are providing a competing product of lesser quality, at lower price. This also seeks to convince installers, consumers, and other relevant parties that they are the innovators of the system.

28.     The Defendants have made statements in commercial advertising claiming that the STORM CATCHER system is the "first new development in hurricane protection in over ten years" knowing full well that the system has been appropriated from ARMOR SCREEN. Upon belief, the Defendants have also utilized photographs from ARMOR SCREEN promotional literature to depict and promote the STORM CATCHER system.

29.     Upon belief, the Defendants have made additional false statements in commerce, in connection with the promotion, advertising and sale of the STORM CATCHER system. ARMOR SCREEN has been certified under the Miami-Dade County Building Code, while the STORM CATCHER system has not.   Nevertheless, statements have been made of a misleading nature, including, but not limited to, the fact that the STORM CATCHER system has been favorably tested

9

by Miami-Dade County, and in other instances that it has been certified by Miami-Dade County.

30.     The Defendants utilize the trademark, SMART TRAX, as part of their offering of the STORM CATCHER system and claim that SMART TRAX is patented technology. No apparent patent number has been listed, creating a question as to whether any patent protection actually exists.

31.     The Defendants have advertised the marks, STORM CATCHER and STORM TRAX utilizing the ® symbol, signifying U.S. Registration, and have done so for a substantial period of time. While applications for U.S. registration now exist, as of the time of filing this Complaint, no trademark registration has issued, and upon belief, these false representations are used knowingly to mislead relevant consumers.

32.     On or about March 30, 2005, BRIAN RIST and STEPHEN JOHNSON were provided formal notice regarding their infringement of U.S. Patent No. 6,865,852. Although their counsel responded generally to counsel for the Plaintiffs, there has been no dedicated statement or explanation that the activities of the Defendants do not infringe the '852 patent. The copy of the '852 patent sent to Defendants' counsel also includes reference to the earlier issued patents included in this suit. The Defendants' continued infringement constitutes willful patent infringement, in utter disregard of the rights of the Plaintiffs.

## COUNT I
## PATENT INFRINGEMENT
### '852 PATENT

33.     This count alleges direct patent infringement against the Defendants, pursuant to 35 U.S.C. § 271(a). The Plaintiffs repeat and reallege Paragraphs 1 - 32 above.

34.     On March 15, 2005, U.S. Letters Patent No.6,865,852 (hereinafter "the '852 patent") were duly and legally issued for a Flexible Protective Wind Abatement System.  A copy of those Letters Patent is attached hereto as Exhibit "A."  Since issuance, the Plaintiff, TARGUS INTERNATIONAL COMPANY, has been and still is the owner of those Letters Patent.

35.     Defendants have been and still are infringing the '852 patent by making, using, selling, or offering to sell, a flexible protective wind abatement system embodying the patented invention, under the trademark, "STORM CATCHER".

36.     The Plaintiffs have given written notice to the  Defendants named in paragraphs 6 - 13 above, of the issuance and claims of the '852 patent and of their infringement of the '852 patent. (See Exhibit "D" attached).

37.     Such acts of infringement have occurred, are occurring, and will continue to occur without the authority or license of TARGUS INTERNATIONAL COMPANY, unless the court permanently enjoins the infringing conduct of the Defendants.

38.     Plaintiffs have been, are being, and will continue to be damaged by the infringing conduct of the Defendants.

39.     The Defendants' acts of infringement are willful, warranting the assessment of increased damages, pursuant to 35 U.S.C. § 284.

## COUNT II
## INDUCING PATENT INFRINGEMENT
## '852 PATENT

40.     This count alleges inducement of patent infringement against the Defendants, pursuant to 35 U.S.C. § 271(b).  The Plaintiffs repeat and reallege Paragraphs 1 - 39 above.

41.    The Defendants have actively and knowingly encouraged, urged and aided other persons and entities to practice one or more claims of the '852 patent, including but not limited to, the making, use, sale, and offering for sale, of a flexible wind abatement system. The Plaintiffs require additional discovery to ascertain the full extent of the Defendants' inducement to infringe.

42.    Defendants have engaged in such conduct with knowledge that the invention claimed in the '852 patent will be utilized by said persons and entities to practice the patent without authorization or license from TARGUS INTERNATIONAL COMPANY.

43.    The Plaintiffs have been, are being, and will continue to be damaged by the infringing conduct of the Defendants.

44.    The Defendants have willfully and deliberately conducted the infringing activities described herein, thereby warranting the assessment of increased damages, pursuant to 35 U.S.C. § 284.

## COUNT III
## CONTRIBUTORY INFRINGEMENT
## '852 PATENT

45.    This count alleges contributory patent infringement against the Defendants, pursuant to 35 U.S.C. § 271(c). The Plaintiffs repeat and reallege Paragraphs 1 - 44 above.

46.    The Defendants have sold and continue to sell materials which are components required to practice one or more claims of the '852 patent.

47.    The materials sold by the Defendants constitute a material for use in the practice of the '852 patent and the Defendants know and have known that such material is adapted for use in practicing the claims in the '852 patent, and are not a staple article of commerce suitable for a substantial non-infringing use.

48.     Such acts of infringement have occurred, are occurring, and will continue to occur without the authority or license of TARGUS INTERNATIONAL COMPANY.

49.     The Plaintiffs have been, are being, and will continue to be damaged by the infringing conduct of the Defendants.

50.     The Defendants have willfully and deliberately conducted the infringing activities described herein, thereby warranting the assessment of increased damages, pursuant to 35 U.S.C. § 284.

## COUNT IV
## PATENT INFRINGEMENT
### '085 PATENT

51.     This count alleges direct patent infringement against the Defendants, pursuant to 35 U.S.C. § 271(a).   The Plaintiffs repeat and reallege Paragraphs 1 - 50 above.

52.     On December 4, 2001, U.S. Letters Patent No.6,325,085 (hereinafter "the '085 patent") were duly and legally issued for a Flexible Protective System to Prevent Penetration of Wind Borne Missiles.  A copy of those Letters Patent is attached hereto as Exhibit "B."  Since issuance, the Plaintiff, TARGUS INTERNATIONAL COMPANY, has been and still is the owner of those Letters Patent.

53.     Defendants have been and still are infringing the '085 patent by making, selling, offering to sell, and using flexible protective systems embodying the patented invention, under the trademark "STORM CATCHER".  They will continue to do so unless enjoined by this Court.

54.     Such acts of infringement have occurred, are occurring and will continue to occur without the authority or license of TARGUS INTERNATIONAL COMPANY, unless the court permanently enjoins the infringing conduct of the Defendants.

13

55.     Plaintiffs have been, are being, and will continue to be damaged by the infringing conduct of the Defendants.

56.     The Defendants' acts of infringement are willful, warranting the assessment of increased damages, pursuant to 35 U.S.C. § 284.

<div align="center">

**COUNT V**
**INDUCING PATENT INFRINGEMENT**
**'085 PATENT**

</div>

57.     This count alleges inducement of patent infringement against the Defendants, pursuant to 35 U.S.C. § 271(b).   The Plaintiffs repeat and reallege Paragraphs 1 - 56 above.

58.     The Defendants have actively and knowingly encouraged, urged and aided other persons and entities to practice one or more claims of the '085 patent, including but not limited to, the sale and installation of a flexible protective system.  The Plaintiffs require additional discovery to ascertain the full extent of the Defendants' inducement to infringe.

59.     Defendants have engaged in such conduct with knowledge that the invention claimed in the '085 patent will be utilized by persons and entities to practice the patent without authorization or license from TARGUS INTERNATIONAL COMPANY.

60.     The Plaintiffs have been, are being, and will continue to be damaged by the infringing conduct of the Defendants.

61.     The Defendants have willfully and deliberately conducted the infringing activities described herein, thereby warranting the assessment of increased damages, pursuant to 35 U.S.C. § 284.

<div align="center">

14

</div>

## COUNT VI
## CONTRIBUTORY INFRINGEMENT
### '085 PATENT

62.     This count alleges contributory patent infringement against the Defendants, pursuant

to 35 U.S.C. § 271(c).  The Plaintiffs repeat and reallege Paragraphs 1 - 61 above.

63.     The Defendants have sold and continue to sell materials which are components

required to practice the invention claimed by the '085 patent.

64.     The materials sold by the Defendants constitute a material for use in the practice of

the '085 patent and the Defendants know and have known that such material is adapted for use in

practicing the invention claimed in the '085 patent and not a staple article of commerce suitable for

a substantial non-infringing use.

65.     Such acts of infringement have occurred, are occurring, and will continue to occur

without the authority or license of TARGUS INTERNATIONAL COMPANY.

66.     The Plaintiffs have been, are being, and will continue to be damaged by the infringing

conduct of the Defendants.

67.     The Defendants have willfully and deliberately conducted the infringing activities

described herein, thereby warranting the assessment of increased damages, pursuant to 35 U.S.C. §

284.

## COUNT VII
## PATENT INFRINGEMENT
### '050 PATENT

68.     This count alleges direct patent infringement, against the Defendants, pursuant to 35

U.S.C. § 271(a).   The Plaintiffs repeat and reallege Paragraphs 1 - 67 above.

15

69.     On January 23, 2001, U.S. Letters Patent No. 6,176,050 (hereinafter "the '050 patent") were duly and legally issued for a Flexible Protective Wind Abatement System. A copy of those Letters Patent is attached hereto as Exhibit "C." Since issuance, the Plaintiffs have been and still are the owner of those Letters Patent.

70.     Defendants have been and still are infringing the '050 patent by making, selling, offering to sell, and using flexible protective wind abatement systems embodying the patented invention, under the trademark "STORM CATCHER". They will continue to do so unless enjoined by this Court.

71.     Such acts of infringement have occurred, are occurring and will continue to occur without the authority or license of TARGUS INTERNATIONAL COMPANY, unless the court permanently enjoins the infringing conduct of the Defendants.

72.     Plaintiffs have been, are being, and will continue to be damaged by the infringing conduct of the Defendants.

73.     The Defendants' acts of infringement are willful, warranting the assessment of increased damages, pursuant to 35 U.S.C. § 284.

<div style="text-align:center">

**COUNT VIII**
**INDUCING PATENT INFRINGEMENT**
**'050 PATENT**

</div>

74.     This count alleges inducement of patent infringement against the Defendants, pursuant to 35 U.S.C. § 271(b).   The Plaintiffs repeat and reallege Paragraphs 1 - 73 above.

75.     The Defendants have actively and knowingly encouraged, urged and aided other persons and entities to practice one or more claims of the '050 patent, including but not limited to,

<div style="text-align:center">16</div>

the sale and installation of a flexible protective wind abatement system. The Plaintiffs require additional discovery to ascertain the full extent of the Defendants' inducement to infringe.

76.     Defendants have engaged in such conduct with knowledge that the invention claimed in the '050 patent will be utilized by persons and entities to practice the patent without authorization or license from TARGUS INTERNATIONAL COMPANY.

77.     The Plaintiffs have been, are being, and will continue to be damaged by the infringing conduct of the Defendants.

78.     The Defendants have willfully and deliberately conducted the infringing activities described herein, thereby warranting the assessment of increased damages, pursuant to 35 U.S.C. § 284.

<div align="center">

**COUNT IX**
**CONTRIBUTORY INFRINGEMENT**
**'050 PATENT**

</div>

79.     This count alleges contributory patent infringement against the Defendants, pursuant to 35 U.S.C. § 271(c). The Plaintiffs repeat and reallege Paragraphs 1 - 78 above.

80.     The Defendants have sold and continue to sell materials which are components required to practice the invention claimed by the '050 patent.

81.     The materials sold by the Defendants constitute a material for use in the method of the '050 patent and the Defendants know and have known that such material is adapted for use in practicing the method claimed in the '050 patent and not a staple article of commerce suitable for a substantial non-infringing use.

82.     Such acts of infringement have occurred, are occurring, and will continue to occur without the authority or license of TARGUS INTERNATIONAL COMPANY.

83.     The Plaintiffs have been, are being, and will continue to be damaged by the infringing conduct of the Defendants.

84.     The Defendants have willfully and deliberately conducted the infringing activities described herein, thereby warranting the assessment of increased damages, pursuant to 35 U.S.C. § 284.

<div align="center">

**COUNT X**
**BREACH OF RESTRICTIVE COVENANT**
**(TROPICAL STORM SHIELD)**

</div>

85.     This count alleges the Breach of the Dealership Agreement between ARMOR SCREEN CORPORATION and TROPICAL STORM SHIELD, INC. under the laws of Florida. The Plaintiffs repeat and reallege Paragraphs 1 - 84 above.

86.     On August 23, 2001, TROPICAL STORM SHIELD entered into an Independent Dealer - Protective Agreement with ARMOR SCREEN CORPORATION, a copy of which is attached hereto as Exhibit "E".

87.     Paragraph 3 of the Agreement prohibits the diversion of any business opportunities from ARMOR SCREEN, or the direct or indirect engagement in any business which sells flexible wind abatement systems or otherwise competes with ARMOR SCREEN, during the term of the Agreement.   It also calls for a period of non-competition for a twenty-four month period after the term of the Agreement ends.  Such provisions are presumed as reasonable under the laws of Florida.

88.     TROPICAL STORM SHIELD, INC. breached Paragraph 3 of the Agreement.

89.     ARMOR SCREEN has been damaged by such breach.

## COUNT XI
## BREACH OF RESTRICTIVE COVENANT
### (21ST CENTURY SCREENS)

90.     This count alleges Breach of the Dealership Agreement between ARMOR SCREEN

CORPORATION and 21ST CENTURY SCREENS, INC. under the laws of the State of Florida.  The

Plaintiffs repeat and reallege Paragraphs 1 - 89 above.

91.     On July 18, 2001, 21ST CENTURY SCREENS, INC. entered into an Independent

Dealer - Protective Agreement with ARMOR SCREEN CORPORATION, a copy of which is

attached hereto as Exhibit "F".

92.     Paragraph 3 of the Agreement prohibits the diversion of any business opportunities

from ARMOR SCREEN, or the direct or indirect engagement in any business which sells flexible

wind abatement systems or otherwise competes with ARMOR SCREEN during the term of the

agreement.   It also calls for a period of non-competition for a twenty-four month period after the

term of the Agreement ends.  Such provisions are presumed to be reasonable under the laws of

Florida.

93.     21ST CENTURY SCREENS, INC. breached Paragraph 3 of the Agreement,

notwithstanding its crossing out certain words in Paragraph 3.

94.     ARMOR SCREEN has been damaged by such breach.

## COUNT XII
## BREACH OF AGREEMENT
### (SAVANNAH TRIMS, INC.)

95.     This count alleges Breach of the Dealer Agreement between ARMOR SCREEN

CORPORATION and SAVANNAH TRIMS, INC.  The Plaintiffs repeat and reallege Paragraphs

1 - 94 above.

19

96. On April 1, 2002, SAVANNAH TRIMS, INC. entered into a Dealer Agreement with ARMOR SCREEN CORPORATION, a copy of which is attached hereto as Exhibit "G".

97. Paragraph 2 of the Agreement requires SAVANNAH TRIMS to use its best efforts to promote ARMOR SCREEN. While SAVANNAH TRIMS pays lip service to its relationship to ARMOR SCREEN, it does nothing more. Instead, it is actively promoting the sale of the STORM CATCHER system at all opportunities, for its own benefit, to the detriment of ARMOR SCREEN.

98. Attached hereto as Exhibit "H" is a recent proposal from SAVANNAH TRIMS, which demonstrates its breach of Section 2 of the Agreement, as part of its participation in the scheme of patent infringement and unfair competition detailed herein. Further, SAVANNAH TRIMS' website actively promotes the STORM CATCHER, including false statements that the system has been certified by Miami-Dade County.

99. ARMOR SCREEN has been damaged by the actions of the Defendant.

## COUNT XIII
## UNFAIR COMPETITION

100. This count alleges Unfair Competition under the laws of Florida. The Plaintiffs repeat and reallege Paragraphs 1 - 99 above.

101. The activities of the Defendants, including their acts in concert with each other, constitute unfair competition against the ongoing business activities of the Plaintiff, ARMOR SCREEN CORPORATION.

20

## PLAINTIFFS' NEED FOR DISCOVERY REGARDING
## VIOLATIONS OF THE LANHAM ACT

102.    As recited in Paragraphs 27 - 31 above, the Defendants are believed to be engaged

in the making of false statements in violation of the Lanham Act, 15 U.S.C. § 1125(a). Discovery

is needed as to the nature and scope of specific false statements and representations, in regard to the

matter mentioned, in order to correctly amend the Complaint to include appropriate violations of the

Lanham Act.


## DEMAND FOR JURY TRIAL

The Plaintiffs request that all issues in this case be tried to a jury.


WHEREFORE, the Plaintiffs pray that this court:

a.    enter judgment against the Defendants for infringement of the '852, '085, and '050

patents and permanently enjoin the Defendants, their principals, officers, directors, agents,

employees, and all persons in active concert or participation with them from further acts of

infringement.

b.    that pursuant to 35 U.S.C. § 284, judgment be entered against the Defendants for

actual damages for the infringement of the '852, '085, and/or '050 patents, including enhanced

damages arising from the willful nature of such infringement.

c.    that pursuant to 35 U.S.C. § 285, the Plaintiffs be awarded costs, prejudgment

interest, and attorney's fees for the infringing acts of the Defendants as to the '852, '085, and/or '050

patents.

    d.      enter judgment against the Defendants named in Counts X - XII for violation of the

restrictive covenants addressed therein.

    e.      enter judgment against the Defendants for unfair competition.

    f.      such other relief as this court may deem appropriate.


Respectfully submitted,

McHALE & SLAVIN, P.A.
2855 PGA Boulevard
Palm Beach Gardens, FL 33410
Telephone:  (561) 625-6575
Fax:        (561) 625-6572
litigation@mspatents.com

_____
Edward F. McHale
Attorneys for the Plaintiffs

22

# EXHIBIT "A"



US006865852B2

(12) **United States Patent**   (10) **Patent No.:**   **US 6,865,852 B2**
Gower                            (45) **Date of Patent:**   **Mar. 15, 2005**

(54) **FLEXIBLE WIND ABATEMENT SYSTEM**

(75) Inventor: **Ted Gower**, North Palm Beach, FL (US)

(73) Assignee: **Targus International, Inc.**, Palm Beach Gardens, FL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 144 days.

(21) Appl. No.: **10/033,030**

(22) Filed: **Nov. 9, 2001**

(65) **Prior Publication Data**

US 2002/0134414 A1 Sep. 26, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/565,211, filed on May 4, 2000, now Pat. No. 6,325,085, which is a continuation of application No. 09/270,249, filed on Mar. 15, 1999, now Pat. No. 6,176,050, which is a continuation-in-part of application No. 08/861,209, filed on May 21, 1997, now abandoned.

(51) Int. Cl.7 .................................................. **E04B 1/00**

(52) U.S. Cl. ..................... **52/222**; 52/4; 52/23; 52/155; 52/202; 52/204.1; 52/273; 52/506.01; 135/90; 135/222; 248/85; 248/87; 248/156; 160/327; 160/368.1; 160/371; 160/DIG. 1; 245/2; 245/5

(58) Field of Search .............................. 52/4, 23, 155, 52/202, 506.01, 204.1, 222, 273; 135/90, 222; 160/327, 368.1, DIG. 19, 371; 248/85, 87, 156; 245/2, 5

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,715,843 A | * | 2/1973 | Ballinger ........................ 52/3 |
| 3,805,816 A | | 4/1974 | Nolte |
| 3,862,876 A | | 1/1975 | Graves |
| 3,949,527 A | | 4/1976 | Double et al. |
| 4,283,888 A | | 8/1981 | Cros |
| 4,397,122 A | | 8/1983 | Cros |

| | | | |
|---|---|---|---|
| 4,429,952 A | * | 2/1984 | Dominguez ............... 359/591 |
| 4,590,714 A | | 5/1986 | Walker |
| 4,643,684 A | * | 2/1987 | Verbeeck ...................... 47/31 |
| 4,858,395 A | | 8/1989 | McQuirk |
| 4,905,821 A | * | 3/1990 | Corbett .................. 206/45.24 |
| 4,932,457 A | * | 6/1990 | Duncan ................... 160/380 |
| 5,192,574 A | * | 3/1993 | Hunt et al. ............... 426/549 |
| 5,237,788 A | * | 8/1993 | Sandow .................... 52/200 |
| 5,347,768 A | | 9/1994 | Pineda |
| 5,383,950 A | * | 1/1995 | Hashemi et al. ............ 65/348 |
| 5,466,503 A | * | 11/1995 | Dischler .................. 428/43 |
| 5,522,184 A | | 6/1996 | Oviedo-Reyes |
| 5,579,794 A | * | 12/1996 | Sporta ................. 135/88.01 |
| 5,599,440 A | * | 2/1997 | Stangeland et al. ........ 208/148 |
| 5,632,839 A | * | 5/1997 | Kish et al. ............... 156/194 |
| 5,639,806 A | * | 6/1997 | Johnson et al. ........... 523/208 |
| 5,720,137 A | * | 2/1998 | Rodriguez ................ 52/202 |
| 5,791,090 A | * | 8/1998 | Gitlin et al. ................. 52/4 |
| 5,915,449 A | * | 6/1999 | Schwartz ................ 160/330 |
| 6,176,050 B1 | * | 1/2001 | Gower ..................... 52/222 |
| 6,230,455 B1 | * | 5/2001 | Arehart et al. ............. 52/202 |

* cited by examiner

*Primary Examiner*—Carl D. Friedman
*Assistant Examiner*—Christy M. Green
(74) *Attorney, Agent, or Firm*—McHale & Slavin, P.A.

(57) **ABSTRACT**

A device for protection of property against high winds comprising a flexible material of predetermined strength and stretch characteristics, and in the form of a panel or several panels, utilized to protect the side of a structure including its windows and doors from the strong winds and debris impacts occurring during a hurricane. The device is anchored in a manner to space it out from the area being protected according to formula provided, and can safely dissipate substantial impacting energy. The preferred embodiment attaches to an overhanging eave and the ground below protecting in addition to the windows and doors, plantings, outdoor furniture, decorative shutters, downspouts, and such as are enclosed behind the barrier Several methods of storage and deployment of said curtain are described including rolling, sliding, and converting to awning. The barrier has the added feature of acting as a tie down in certain applications.

**11 Claims, 5 Drawing Sheets**





*FIG. 1*

*FIG. 2*



*FIG. 3*

*FIG. 4*

*FIG. 5*



*FIG.  6*          *FIG.  7*



FIG. 8

FIG. 9



*FIG. 10*

*FIG. 11*

US 6,865,852 B2

1

## FLEXIBLE WIND ABATEMENT SYSTEM

This application is a continuation-in-part of Ser. No. 09/565,211 filed May 4, 2000, now U.S. Pat. No. 6,325,085, which is a continuation of Ser. No. 09/270,249, filed Mar. 15, 1999, now U.S. Pat. No. 6,176,050 B1, which is a continuation-in-part of Ser. No. 08/861,209, filed May 21, 1997 now abandoned. The content of all the prior applications and the prior art cited in each of the applications is incorporated herein by reference.

## TECHNICAL FIELD

This invention relates to the protection of property against high winds and, in particular, to a flexible protective barrier device for securing property from damage from the wind itself and from the impact of foreign objects carried by wind as occasioned by hurricanes, tornadoes and the like.

## BACKGROUND ART

As is known by one skilled in the art of protecting buildings and the like from damage caused by missile-like objects that are occasioned by the heavy winds of hurricanes or tornadoes, there are commercially available variations of hurricane protective devices, often called shutters, that fasten immediately over the frangible area to be protected. These devices are typically expensive to purchase, cumbersome, made from stiff, heavy material such as steel and aircraft quality aluminum alloy or occasionally plastic with reinforcing. Many need to be manually connected and then removed and stored at each threat of inclement weather. Many require unsightly and difficult-to-mount reinforcing bars at multiple locations. Further, these known shutters are usually opaque, preventing light from entering a shuttered area and preventing an inhabitant from seeing out. Likewise, it is desirable that police be able to see into buildings to check for inhabitants and to prevent looting which can be a problem in such circumstances. Missiles, even small not potentially damaging missiles, striking these heretofore known shutters create a loud, often frightening bang that is disturbing to inhabitants being protected.

Standardized testing requiring these protective devices to meet certain standards of strength and integrity has been introduced for various utilizations and locales. In order to qualify for use where said testing requirements apply, the strength and integrity characteristics of these protective devices must be predictable and must be sufficient to meet said standards. Additionally, and as is obvious to one skilled in the art, it is beneficial to qualify for said standards even in situations in which standards do not apply. As a result of said standards, many undesirable aspects of the heretofore known shutters have been acerbated. They have become more cumbersome, more bulky, heavier, more expensive, more difficult to store, and remain generally opaque and noisy when impacted. To incorporate sufficient strength to meet said requirements, weight and bulk become a problem over six feet in span. The useable span (usually height) of the heretofore known shutters that meet said standards may be limited to eight feet or less. This makes protecting large windows, for example, or groupings of windows, with the heretofore known devices cumbersome, expensive and impractical. Devices that are intended to be deployed in a roll down manner either manually, automatically, or simply by motor drive, have been difficult to strengthen sufficiently to pass the test requirements and require unsightly reinforcing bars every few feet.

Prior to the introduction of said standards, an ordinary consumer had very little useful knowledge of the strength

2

and integrity of said shutters. It is believed shutters of the pre-standard era were very weak such that all would fail the present standardized testing. It should be understood that the standards are not intended to provide a shutter that will protect in all situations. As the hurricane conditions can be very violent and destructive, the standards are not intended to require strength and integrity sufficient to protect in all circumstances. The standards simply provide a benchmark as to strength and integrity. Said strength and integrity of shutters can now be measured.

There are a sundry of patents that teach the utilization of knitted or woven fabric such as netting, tarpaulins, drop cloths, blankets, sheets wrapping and the like for anchoring down recreational vehicles, nurseries, loose soil and the like. But none of these are intended for, nor are capable of withstanding the forces of the missile-like objects that are carried by the wind in hurricanes. Examples where fabric or netting material that encapsulates the unit to be protected as by covering the entire unit and fastening the ends of the fabric to the ground are disclosed in the following patents. U.S. Pat. No. 3,862,876 issued to Graves, U.S. Pat. Nos. 4,283,888 and 4,397,122 issued to Cros, U.S. Pat. No. 4,858,395 issued to McQuirk, U.S. Pat. No. 3,949,527 issued to Double et al., U.S. Pat. No. 3,805,816 issued to Nolte, U.S. Pat. No. 5,522,184 issued to Oviedo-Reyes, U.S. Pat. No. 4,590,714 issued to Walker and U.S. Pat. No. 5,347,768 issued to Pineda. The U.S. Pat. No. 5,522,184 for example, provides a netting that fits flush over the roof of a building and uses a complicated anchoring system to tie down the netting to strengthen the building structure against hurricanes and wind storms.

Certain types of flexible material that are capable of withstanding high wind loading or impact loads without bursting, can be disposed in front of the building or other structures intended to be protected, and anchored on opposing edges, to form a curtain sufficiently spaced from the frangible area to contain the impact of foreign objects hurled by the high winds. For example, in a building the top edge of the fabric may be anchored to the eave of the roof and the bottom of the fabric may be attached to anchors imbedded in the ground or cement, so as to present a curtain adequately spaced out from and in front of the structure of the building to be protected. Not only does this afford frontal protection but, properly located and attached, it also serves to tie down the roof and protect it from blowing off. The winds that would ordinarily blow off the roof exert a force on the fabric which, in turn, exerts a downward force on the roof to act against the lifting forces tending to lift the roof.

Thus, what is lacking in the art is a flexible protective barrier constructed from a mesh material that can be easily stored and deployed for protecting the frangible portion of a structure from objects carried by the wind.

## SUMMARY OF THE INVENTION

This invention contemplates the use of a flexible barrier, preferably a reasonably transparent, woven synthetic textile that is able to satisfy stringent testing requirements. Knitted or extruded material can be an alternative if the material itself meets the criteria described later herein. The use of this invention allows very large areas with spans of greater than 25 feet to be covered with ease. Thus most window groupings, even several stories of a building, could be readily protected. This invention is light in weight, easy to use, does not require reinforcing bars, can be constructed in varying degrees of transparency, can be weather tight, is economical, and is capable of dissipating far greater forces

**3**

without damage than the heretofore known stiff devices. Missiles striking this barrier make very little sound. This invention is suitable to be configured with the necessary motor and supportive devices for automatic deployment.

Heretofore known devices have internal stiffness and rigidity that resists deflection, or bending. It is this stiffness that stops the missile short of the frangible surface being protected. This invention does not have rigidity but rather is very flexible, which give several positive features including allowing for ease of storage as by rolling or folding. The flexible barrier of the invention is placed a distance out from the surface to be protected. An impacting missile stretches the barrier until it decelerates to a stop or is deflected. The barrier material has a predetermined tensile strength and stretch that makes it suitable for this application. Said known strength and stretch, together with the speed, weight and size of the impacting missile, all of which are given in test requirements, permit design calculation to ascertain barrier deflection at impact. This deflection is a determinate of the minimum distance that this barrier is to be spaced out from the frangible area to be protected. Other determinates which may be included are additional deflection from wind pressure and from slack from an improper installation.

The barrier of this invention is mounted farther away from the surface to be protected than the prior art structures, thereby providing room for a longer deceleration of impacting flying debris (missiles). Thus greater energy from a missile can be safely dissipated than is possible with the prior art structures, and the energy which can be safely dissipated is calculable.

The distance which the barrier is spaced out from the frangible surface need not be great and is quite workable with existing structures. Even though the distance is not great, said distance does allow a significantly increased distance and time of deceleration such that the barrier will stop far stronger impacts than with the heretofore known rigid devices. In simple terms, the missile is slowed to a stop by elasticity as the barrier stretches. The greater the stretch, the greater the impact. Thus the building is not subjected to an abrupt harsh blow as the impact on the shutter is transferred to the building. The energy transfer is much gentler and less destructive than with the rigid devices.

It will be obvious to one skilled in this art that this device goes beyond merely hanging a curtain in front of a structure and hoping wind born missiles will be stopped. This invention provides a method of calculating the minimum spacing of said barrier from the frangible surface and provides understanding as to the strength and integrity of said barrier. This invention contemplates using a screen-like fabric with interstices that permit the light to pass through and that is reasonably transparent. Of course, if interstices are utilized in the fabric makeup, the size of the interstices must consider the size of the missiles such that the missiles do not pass therethrough. If transparency is not desirable, the fabric can be made sufficiently dense to minimize or eliminate the interstices. To assure a long life, the material of the fabric preferably would be resistant to the ultra violet radiation, and to biological and chemical degradation such as are ordinarily found outdoors This invention contemplates either coating the material or utilizing material with inherent resistance to withstand these elements. A synthetic material such as polypropylene has been found to be acceptable An example of a coated material is vinyl coated polyester Materials intended to be used outdoors in trampolines, for example, are likely candidates for use in this invention. Black colored polypropylene is most resistant to degradation from ultra violet radiation. Other colors and vinyl coated

**4**

polyester are sufficiently resistant, particularly if the barrier is not intended to be stored in direct sunlight when not in use.

The preferred embodiment allows air passage through it, albeit at substantially reduced rate. An upwind pressure of 1" of mercury, which roughly translates into a 100 miles per hour (mph) wind, forces air through at 250 cubic feet per minute (cfm) or approximately 3 mph. The amount of air passage depends on the interstice size. If a weather tight and transparent barrier is desired, the polypropylene material may be laminated with a flexible clear plastic skin.

It is of importance that the material affords sufficient impact protection to meet the regulatory agencies' requirements in order for this to be a viable alternative to other hurricane protective mechanisms. While stiff structures, such as panels of metal, are easily tested for impact requirement and have certain defined standards, fabrics on the other hand, are flexible and react differently from stiff structures. Hence the testing thereof is not as easily quantified as the stiffer materials. However, certain imperial relationships exist so that correlation can be made to compare the two mediums. Typically, the current impact test of certain locales requires a wood 2x4 stud be shot at the barrier exerting a total force of approximately 230 pounds, or 61.3 pounds per square inch (psi), over its frontal (impacting) surface. This impact and resultant force relate to the Mullen Burst test commonly used by manufacturers to measure the bursting strength of their fabrics. Thus the impact test heretofore used on rigid devices will work equally well on this flexible device.

The preferred embodiment of this invention would use a textile of the type typically used in trampolines which would burst at 675 psi or a total of 2,531.25 pounds over the same 3.75 square inch frontal surface of the nominal 2x4 test missile and would stretch 21% immediately prior to failure. The strength and stretch characteristics of the material are known. The strength of this fabric is more than eleven (11) times the 230 pounds of strength required to withstand the above-described 2x4 missile test as presently required by said regulatory agencies. Stronger fabrics are available. Others are available in various strengths, colors and patterns. The maximum deflection can readily be calculated and hence the distance that the fabric must be spaced from the surface being protected can be easily ascertained.

As one skilled in this art will appreciate, the reason for the utilization of stiff materials for protection against the high winds and missile-like objects propelled thereby is because heretofore known barriers are mounted close to the frangible object being protected. Obviously, if the protective material is mounted close to the protected surface, it must necessarily be stiff in order to stop the missile short of the protected frangible surface. In such a situation, impacting missiles are required to come to an abrupt stop. Such abrupt stop of the missile on impact with the surface of the protecting structure is less desirable because the rapid energy dissipation has the propensity to cause damage not only to the protective device, but to the structure being protected as well. An extended controlled deceleration is not available if the barrier is mounted close to the frangible surface.

The use of flexible fabric distanced out from the frangible area as a protective barrier allows extended deceleration. When the strength and stretch properties of the fabric are known and allowed for, the extended deceleration becomes controlled. By mounting the protective barrier some distance from the frangible surface, a distance that is calculable, the missile can be decelerated to a stop prior to contacting the

US 6,865,852 B2

5

frangible surface. In other words, in any situation where the missile must stop prior to impacting the frangible surface being protected, it is desirable to decelerate the missile through an extended controlled deceleration. This invention does precisely that.

An extended deceleration has much less propensity to cause damage than an abrupt deceleration. Since the use of a flexible material as a protective barrier affords an extended deceleration, very strong impacts can be withstood. It is contemplated that this invention, using the proper material and the proper assembly, will be sufficient to meet all foreseeable impact test requirements and regulations for wind and debris protection. Such requirements and regulation would include more severe tests being contemplated for specialized, high protection, shelters.

Thus, an object of this invention is to provide a barrier made from fabric to protect the frangible portions of a building and the like. A feature of this invention is spacing the barrier out from and in front of the frangible area to be protected by attaching two opposing edges to anchors located so as to position the barrier as described. Another feature is the formula for calculating minimum spacing.

For example, one edge of the fabric can be anchored to the overhang of the roof or other high structure and the opposite edge of the span to the ground or low structure to provide a barrier spaced from and in front of the object to be protected. The lower anchors can be attached to the ground by imbedding in cement or other ground attachment such as tie downs or stakes and the like and providing grommets, rings or other attachments in the fabric to accept a clamp, cable, rope, and the like. The barrier is sufficiently spaced from the structure being protected in order to absorb and dissipate the energy from impact prior to the impacting object reaching the structure. The deceleration of the impacting object is extended in comparison to a stiff barrier.

The curtain-like barrier of this invention is characterized as a reasonably transparent barrier with strength and simplicity that is unattainable with the heretofore known barriers. Wind loading on windows is eliminated. Impact by a missile does not cause a large bang, and is not disturbing. Frame harmonics are reduced or eliminated, such harmonics are known to cause catastrophic failure of structures. The envelope of the structure is secured even if a window has failed. Wind lift is spoiled to prevent uplifting of roofs.

It is easy to install, requires low maintenance and has low acquisition cost. There is much flexibility with storage. It can either be left in place or rolled much as a shade, or slid out of the way much as a curtain, so as not to obstruct the translucent of the window or interfere with the aesthetics of the building. It can also be fully removed and stored out of the way, or swung up to form a canopy when not in use as a protective barrier. It is preferable but not essential, that the material selected to be used in the netting fabric of this invention be inherently resistant to elements encountered in the outdoors or can be coated with coatings that afford resistance to these elements. Another feature of this invention is that it is capable of providing the dual function of protection against flying missiles as well as providing anchoring capabilities, such as tying down the roof of the building or structure being protected to prevent it from being lifted off.

Another feature of this invention is that it can be reasonably transparent if desired without adversely affecting the integrity of the barrier.

Another objective of this invention is that wind loading on windows is eliminated wherein the wind load is transferred to the surrounding support structure.

6

Still another objective of this invention is to reduce or eliminate structure harmonics caused by high winds and the resulting structure failure caused by such vibrations.

Yet still another objective of this invention is to maintain the envelope of the structure to prevent uplifting of the roof support by wind entering of the structure.

Another objective of this invention is to provide a means to spoil wind lift that may be otherwise cause a roof structure to detach from a structure.

Another feature of this invention is that missile impact is reasonably quiet and not a loud frightening bang as with heretofore known rigid devices.

Other objectives and advantages of this invention will become apparent from the following description taken in conjunction with the accompanying drawings wherein are set forth, by way of illustration and example, certain embodiments of this invention. The drawings constitute a part of this specification and include exemplary embodiments of the present invention and illustrate various objects and features thereof.

BRIEF DESCRIPTION OF DRAWINGS

FIG. 1. is a partial view in perspective and schematic illustrating this invention in the deployed position and attached a building;

FIG. 2 is a partial view in section illustrating mechanism for tying down the protective barrier;

FIG. 3 is a perspective of the barrier fabric;

FIG. 4 is a detailed showing of alternative mechanism for attaching the barrier to a structure;

FIG. 5 is a partial view illustrating a panel edge closing;

FIG. 6 is a partial section of a tie-down;

FIG. 7 is a partial section of another tie-down along line 7—7 of FIG. 8;

FIG. 8 is a perspective, partly in section, of the tie-down of FIG. 7;

FIG. 9 is a perspective, partly in section, of a ground anchor and connection to the barrier;

FIG. 10 is a perspective of an edge closure; and

FIG. 11 is a perspective of another edge closure.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The invention does not derive its strength from stiffness or rigidity but rather from its bursting strength and stretch, with the latter acting like a spring to gradually decelerate any impacting missile. To be able to calculate the minimum distance that the barrier must be placed out from the area to be protected, the frontal area, weight and speed of the test missile must also be known. Wind speed may become a significant factor in large spans.

There are many additional desirable characteristics of this invention such as transparency, resistance to weathering, light weight, ease of installation, deployment and storage, economy

While this invention is shown in its preferred embodiment as being utilized to protect the windows and overhang roof of a structure, it is to be understood that this item has utility for other items requiring protection and is applicable to other types of structures. Where appropriate, the barrier can be deployed horizontally or at any angle as well as the vertical as shown in FIG. 1.

Reference is now made to FIG. 1 which shows a building structure 10 intended to be protected from the onslaught of

7

winds and debris typically occasioned during a hurricane. FIG. 1 shows barrier 61 deployed to completely envelop the building structure 10. In this embodiment, the roof 68 is completely covered by barrier panel 61 which has integral side panels 62 and 64 which extend from the roof to the ground. A shorter end panel 62 protects the end of the building and longer front panel 64 covers the front of the building. Of course, these panels are duplicated at the other end and rear of the building. As shown, the side panels are sloped outwardly from the roof toward the ground. This orientation creates a gap between the panels at the corners of the building. A joining panel 63, shown in FIG. 1, connects the adjacent side panels and provides a continuous barrier surrounding the structure. A joining panel is in place at all four corners of the building.

FIG. 2 illustrates an anchoring system 65 that provides a tie-down for the barrier side panels and joining panels which provides a holding power at least equal to the burst strength of the barrier material. As shown, the side panel 62 has a continuous folded reinforced hem 69 attached to an anchoring strap 66. The strap 66 is passed through the eye of a ground anchor 72. The ground anchor 72 is similar to the ground anchor 110, shown in FIG. 9. The free end of the strap 66 is threaded through a friction buckle 67 which has a locking roller 82. As tension is applied to the strap 66, the friction grip of roller 82 increases.

The upper margin of the side panels may have a batten 70, as shown in FIG. 4. The upper edge of the side panels may be attached to the roof beyond the batten (not shown). The batten 70 may be attached to the building over the eave 71 or to the barrier. The batten 70 serves the dual purpose of protecting the edge of the roof and providing a large diameter, smooth surface about which the barrier turns approximately 90 degrees. The batten may be made of any material which will not deform under the compression and shear created by the barrier under a wind load.

A suitable material for the barrier 61 is polypropylene formed in a monofilament and woven into a geotextile (style 20458) manufactured by Synthetic Industries of Gainesville, Ga. The fabric is woven in a basket (plain) weave as shown in FIG. 3 where the fill 11 and warp 13 threads alternately cross over and under adjacent fills and warps. In the preferred embodiment the interstices are substantially equal to 0.6 millimeters which approximates the interstices of commercially available residential window screening.

The barrier fabric may be coated or have inherent resistence to withstand the elements. A synthetic material such as polypropylene has been found to be acceptable. Also, a vinyl coated polyester may be used in the barrier. Materials intended to be used outdoors in trampolines, for example, are likely candidates for the barrier material. Such materials have a burst or failure limit of 675 pounds per square inch (psi). Black colored polypropylene is most resistant to degradation from ultraviolet (UV) radiation.

The preferred embodiment has air permeability albeit at substantially reduced rates. An upwind pressure of 1 inch of Mercury (Hg.), which is roughly equivalent to 100 miles per hour wind speed, forces air through the material at approximately 250 cubic feet per minute (cfm) or approximately 3 mph. The amount of air permeability depends on interstice size. If a weather tight and transparent curtain is desired, the polypropylene material may be laminated with a flexible clear plastic skin.

The selection of interstice size and configuration is dependent on the amount of transparency and air passage desired and the limitation that the maximum size must be sufficiently

8

small to prevent objects that are potentially damaging on impact from passing therethrough. The above mentioned regulations set in place by Dade County, Florida have determined that the smallest diameter missile (wind blown debris) with which they are concerned is ⅛ inch in diameter. Therefore to satisfy the Dade County Regulations the interstices must be small enough to prevent ⅛ inch diameter missiles from passing therethrough. Other regulations may set other minimum missile diameter sizes. The interstice size would similarly relate thereto if the barrier were intended to satisfy said other regulations.

The endurance, physical, hydraulic and mechanical properties of the textile are recorded and available from the manufacturer, Synthetic Industries. It is important to this invention that whatever type of material is utilized, the fabric made up from this material must exhibit sufficient impact strength for resisting the test impact loads at least to the values dictated by the various industrial, insurance and government regulating agencies. This particular fabric has been shown to be able to withstand forces at over 11 times the test load required by the regulating agency presently in the forefront of standard setting.

The material selected must meet certain strength criteria. These criteria, together with the size of span covered by the barrier, constitute the basis for calculating the spacing of the barrier from the object being protected. Said spacing is calculated as follows:

1) The fabric must be sufficiently strong that the impact force it is required to withstand is less than the failure force (Mullen Burst).

2) The impact (test) force is then divided by the force required to cause failure (Mullen Burst). This quotient is then multiplied by the known stretch at failure to obtain the stretch factor. The woven polypropylene synthetic fabrics of the type used in the preferred embodiment stretch 20–22% just prior to failure, depending on manufacturing technique. This stretch information is available from the manufacturer.

3) The actual stretch measurement is then calculated and in conjunction with the span of the barrier used to ascertain the maximum deflection. This maximum deflection is the minimum distance the barrier should be spaced from the frangible object being protected.

EXAMPLE

The preferred embodiment is used as an example to demonstrate this formula. The preferred embodiment is a polypropylene, woven monofilament geotextile. The individual filaments are woven into a basket weave network and calendered so that the filaments retain dimensional stability relative to each other. This geotextile is resistant to ultra violet degradation and to biological and chemical environments normally found in soils. This fabric is often used as the mat for outdoor trampolines and is intended to be very resistant to weathering. The fabric is known to stretch a maximum of 21% prior to failure and requires a force of 675 psi to fail.

1. The present test that was originally legislated by Dade County Florrida and may become the standard in the industry, requires the barrier to withstand a force of only 61.3 psi. Consequently the fabric meets and exceeds the first requirement of strength.

1. The stretch factor calculation is (test load/maximum load×% stretch at maximum load=stretch factor) 61.3/675×21=1.9%. This becomes a constant factor insofar as this fabric and the Dade test remain involved. The calculation will change if any one or more of the

strength, energy or stretch characteristics of the test or fabric are modified. Likewise, it is known that stretch varies directly with force up to the maximum at failure. To calculate the actual stretch, the calculation is stretch factor×height=actual stretch. Therefore if the distance between the two fastened sides is eight feet (96 inches), the stretch measurement will be 96×1.9%=1.83".

2. To calculate the deflection, right triangles are used such that the hypothenuse is ½ of the sum of the height plus stretch (97.83/2=48.92"). The known side is ½ of the height (96/2=48"). Thus the deflection=the square root of the difference between the square of the hypothenuse less the square of the known side. This result is 9.4" which is the maximum deflection on impact by test missile.

3. Thus to meet the prescribed standard the barrier must be mounted so as to be spaced at least 9.4 inches from the surface to be protected if an eight (8) foot span is to be used. A longer span will require wider spacing, a shorter will require less. The table shown below reflects this spacing for various sample distances of span with this preferred fabric.

Table demonstrating relationship between Span and Maximum Deflection in the Preferred Embodiment as Described Above.

| Height | Deflection |
|---|---|
| 8 feet | 9.4 inches |
| 10 " | 11.8 " |
| 12 " | 14.1 " |
| 14 " | 16.5 " |
| 16 " | 18.8 " |
| 18 " | 21.2 " |
| 20 " | 23.5 " |
| 22 " | 25.9 " |
| 24 " | 28.2 " |
| 30 " | 35.2 " |
| 40 " | 47.0 " |

The aforementioned formula is sufficient to provide spacing to meet the test standards. As the spacing is intended to be minimum, and although the barrier is intended to meet or exceed test standards as opposed to warranting protection in actual situations which are difficult to predict, this invention can include an additional factor in the spacing to allow for maximum wind pressure. Arbitrarily assuming a 115 mph wind at 90 degrees to the barrier and assuming the barrier has been made weather tight with no air flow through the barrier to somewhat relieve pressure, and assuming the barrier is installed at sea level where air is densest, the additional pressure on the barrier will be 0.237 pounds per linear inch of span. This additional pressure can be resolved into a vector and added directly to the test force of 61.3 pounds. Thus an 8 foot barrier will have an additional (0.237×96=) 22.75 pounds added for a total of 84.05 pounds. A 40 foot barrier will have (0.237×480=) 113.76 pounds added for a total of 175.06 pounds. This number should be substituted into the above formula to give a more accurate calculation of minimum spacing.

For example: an 8 foot barrier could deflect 10.9" when allowing for a 115 mph wind factor rather than 9.7" if the wind was not factored in. The deflection of a 40 foot barrier becomes 80.28" (6.69') rather than 47" (3.9').

Obviously, once the minimum space between the barrier and the structure being protected is established, the fabric must be anchored in a suitable manner so as to absorb the

loads without being torn from its support. In some installations, the building may have adjacent areas, such as a patio or pool deck or drive way, with concrete, cement or other materials. In such cases, as shown in FIGS. **6** and **7**, the lower edge is fastened by anchors set in recesses **22** formed into the cement to bury or partially bury eyebolts **24**. The eyebolts **24** are permanently screwed into the remaining portion of the cement. Obviously this invention contemplates other methods of anchoring the top and bottom of the curtain panels depending on the particular application.

In FIG. **9**, the a ground anchor **110** is used to secure the barrier to the earth. These anchors may vary in design to provide the requisite holding power in different soils. The designs include ground anchors typically used to secure telephone pole guy wires to the ground. In FIG. **9**, the anchor **110** has an eye **116** coupled to a clamp **112** similar to clamp **32**.

Equally obvious is the fact that the sides of the panels where appropriate can likewise be anchored. As shown in FIG. **5**, side edges of mating panels may be provided with releasable fasteners **76**. As shown, the fastener is in the form of a zipper but other fasteners may be employed, such as hooks-and-eyes, grommets-and-turn posts, male-and-female snaps, or button-and-holes. The fastener **76** is protected by a fly **73** attached along the length of the fastener to one panel. The fly has a cohesive closure, such as Velcro, with the cooperating tapes **78** disposed on the free edge of the fly and on the other panel. As shown, the joining panel **63** has a releasable fastener **76** along one edge and a fly **73** attached parallel with the fastener. Side panel **64** has a cooperating member of the fastener **76** attached along one edge and a closure strip parallel to the fastener.

The panels may also be fabricated with a selvage or hem or can utilize a reinforcing tape such as "Polytape" that is made from a polypropylene material. The selvage or tape may include commercially available grommets or rings to accept the tie-down hardware. The attachment ring **30** carries a self-locking clamp **32** adapted to fit the eyebolt **24** to tie down the curtain. In FIG. **7** clamp **32** captures a rod **38** and clamps to the eyebolt **24**. In the FIG. **8** embodiment the clamp **32** is fitted to a sturdy rod **38** running the length of the bottom edge of the barrier that is secured in the hem formed by folding the material of the curtain as shown. In FIG. **8** the end cap **40** can serve as a glide in a track if end tracks (not shown) are desired for raising and lowering the barrier. An automatic deployment system could require such end tracks. The same reference numerals depict like parts in all the FIGS. Commercially available grommets or attached rings **30** may be utilized to hold the clamp **32**. In this manner the curtain is anchored via the clamp **32** and eyebolt **24**. Rod **38** may include an end cap **40** mounted on the end thereof to prevent the rod from falling out of the loop of the curtain.

One method of rolling up the curtain in order to move it out of the way when not in use requires a pull cord (not shown) that is looped around the end of the rod **38**. The free end freely hangs and allows the operator to pull or release it to roll up or let down the curtain as required. Ideally the deployed curtain should only be sufficiently taunt to take out slack. If during the installation slack is left this should be allowed for in calculating the said minimum spacing.

The edges at the top and bottom of each panel of the curtain are folded over one or two times, forming a hem, to assure the structural integrity of the panels. The side edges of the curtains may be suitably attached to the siding of the building (not shown) in which the material is wrapped around a batten, such as batten **70**, which is in turn fastened to the wall with appropriate screws.

US 6,865,852 B2

11

Alternative end fastenings are shown in FIGS. 10 and 11 wherein the ends are overlapped and releasably secured one to the other. In FIG. 10, the hemmed edge of side panel 62 is connected to joining panel 63 using two parallel strips 98, 99 of cohesive releasable fastener material on each panel. The joining panel 63 is releasably connected to side panel 64, as shown in FIG. 11, through the hemmed edges which have reinforcing tapes 95 and 96. A plurality of loops 94 are fixed along the length of the edges with each loop threaded through a ring 90 in a butterfly pattern. As shown, the loops 94 on panel 63 are connected to releasable clamps 92. The clamps 92 cooperate with a double ended ring 90. The double ended rings 90 are attached to the loops on panel 64. To close the air gap at the extreme edges of the panels, a cohesive fastener 99, such as Velcro, is attached to both panels. The reinforcing tapes and the loops may be of the same material as the barrier.

What is shown by this invention is a simple, adaptable, transparent, economical, and aesthetically pleasing device that is suitable to protect the building, doors and windows from the forces of winds occasioned by hurricanes and the debris carried by the winds. The textile barrier can either be removed and stored in a very simple manner without requiring a lot of space or could remain installed and either rolled, swung or slid out of the way.

Although this invention has been shown and described with respect to detailed embodiments thereof, it will be appreciated and understood by those skilled in the art that various changes in form and detail thereof may be made without departing from the spirit and scope of the claimed invention.

I claim:

1. A process for maintaining integrity of a structure containing frangible portions subject to impact from wind-borne objects comprising:

providing a protective barrier device formed of a flexible mesh material having a burst strength greater than 61.3 psi and an interstice size constructed and arranged to

12

prevent passage of wind-borne objects greater than about 3/16 inch diameter;

positioning said protective barrier device in juxtaposed relation to said frangible portions of said structure; and

securing said protective barrier to said structure,

wherein said protective barrier provides reduction of wind force sufficient to maintain the integrity of said structure and said protective barrier device is resistant to ultra violet, biological, and chemical degradation.

2. The process of claim 1 wherein said protective barrier device is formed as at least one panel including a peripheral hem adapted to secure said panel to said structure.

3. The process of claim 1 wherein said protective barrier device is a textile formed from synthetic threads.

4. The process of claim 2 wherein said synthetic threads are polypropylene.

5. The process of claim 2 wherein said synthetic threads are vinyl-coated polyester.

6. The process of claim 2 wherein said panel is transparent.

7. The process of claim 2 wherein said panel includes a superposed layer of continuous film.

8. The process according to claim 1 further including a step of:

providing a plurality of releasable fasteners for attachment of said panel to said structure.

9. The process according to claim 2 wherein said protective barrier includes a plurality of said panels, each said panel having parallel edges being releasably connected to said structure by a plurality of cooperating releasable fasteners spaced therealong.

10. The process in accordance with claim 9 wherein said spaced fasteners are reinforced with a tape.

11. The process in accordance with claim 8 wherein said tape is polypropylene.

* * * * *

EXHIBIT "B"

US006325085B1

(12) **United States Patent**
Gower

(10) **Patent No.:** US 6,325,085 B1
(45) **Date of Patent:** Dec. 4, 2001

(54) **FLEXIBLE PROTECTIVE SYSTEM TO PREVENT PENETRATION OF WIND BORNE MISSILES**

(75) Inventor: **Ted Gower**, N. Palm Beach, FL (US)

(73) Assignee: **Targus International Company**, Palm Beach Gardens, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/565,211**

(22) Filed: **May 4, 2000**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/270,249, filed on Mar. 15, 1999, now Pat. No. 6,176,050, which is a continuation-in-part of application No. 08/861,209, filed on May 21, 1997, now abandoned.

(51) Int. Cl.[7] .................................................. E04H 12/20
(52) U.S. Cl. ............................... 135/90; 52/202; 52/222; 135/115; 135/913
(58) Field of Search ............................. 52/3, 4, 260, 23, 52/144, 145, 202, 203, 222, DIG. 11; 135/88.01, 90, 115

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,522,165 | * | 6/1996 | Molla .................................. 40/604 |
| 5,535,565 | * | 7/1996 | Majnaric ......................... 52/426 |
| 5,579,794 | * | 12/1996 | Sporta ..................... 135/88.01 |
| 5,687,512 | * | 11/1997 | Spoozak .......................... 52/23 |
| 6,161,339 | * | 12/2000 | Cornett .......................... 52/23 |
| 6,176,050 | * | 1/2001 | Gower ........................... 52/222 |
| 6,230,455 | * | 5/2001 | Arehart ......................... 52/202 |

* cited by examiner

*Primary Examiner*—Beth A. Stephan
(74) *Attorney, Agent, or Firm*—McHale & Slavin, P.A.

(57) **ABSTRACT**

A flexible material is included within a structure to prevent wind borne missiles or debris from penetrating the confines of the structure. The flexible material may be included within the confines of a building in a free standing form or incorporating one or more interior walls of the building or structure. The flexible material may be attached to the exterior of a structure to cover openings in the structure.

**20 Claims, 4 Drawing Sheets**



**U.S. Patent**      Dec. 4, 2001      Sheet 1 of 4      US 6,325,085 B1

## FIG.  1



## FIG.  2



*FIG.  3*



*FIG.  4*      *FIG.  5*



*FIG. 6*



*FIG. 7*

*FIG. 8*

## FIG. 9



## FIG. 10



US 6,325,085 B1

1

# FLEXIBLE PROTECTIVE SYSTEM TO PREVENT PENETRATION OF WIND BORNE MISSILES

This application is a continuation in part of Ser. No. 09/270,249, filed Mar. 15, 1999 now U.S. Pat. No. 6,176, 050, which is a continuation in part of Ser. No. 08/861,209, filed May 21, 1997 now abandoned. The entire contents of both applications are incorporated herein by reference.

## FIELD OF THE INVENTION

This invention relates to the protection of property against high winds and, in particular, to a flexible protective barrier device placed on or inside a structure for securing property against the force of winds and from impact of foreign objects carried by the wind as occasioned by hurricanes, tornadoes and the like.

## BACKGROUND OF THE INVENTION

There are various types of hurricane shutters that are attached to the outside of buildings to cover openings in the structure, such as windows and doors, to provide protection from high winds and debris. Usually, these shutters are constructed of rigid materials which will withstand significant impact, by wind or objects, and maintain their integrity. In order for the shutters to be effective, all the openings in the entire structure must be covered. The shutters, themselves are expensive and require time and skill to install or remove.

Flexible materials, such as netting, tarpaulins and blankets have been used to protect and anchor vehicles, mobile homes and other shelters. These materials are also placed on the outside of the objects to which they are attached and should cover the entire object. An example of such materials is shown in U.S. Pat. No. 5,579,794 to Sporta. While these materials do not significantly contribute to the structural integrity of the enclosed object, they do provide protection from flying debris. With these flexible materials, it is important that they are anchored in such a manner that the deflection caused by the wind speed does not exceed the distance between the material and the enclosed structure. In such an instance, the enclosed structure could sustain damage or breakage without penetration of debris through the flexible materials. Further, if the flexible materials are anchored over large spans without support, chafing may occur in the materials between the anchoring mechanism and/or the protected structure.

Because both the rigid shutters and the flexible materials reduce or eliminate the ingress and egress from the protected structures, they are not normally deployed. Therefore, a warning should be given which allows enough time to deploy the protective devices. As has been demonstrated over and over, forecasting the onset of hazardous weather is notoriously unreliable. Sometimes, because of the vagaries of the weather and the forecasting, there is not enough time before the storm hits to completely install such systems.

Thus what is lacking in the art is a inexpensive protective barrier that can be included on or inside a portion of a structure or quickly deployed on or within a portion of a structure for protecting the occupants and the property.

## SUMMARY OF THE INVENTION

This invention contemplates the use of a flexible barrier of woven synthetic textile that is able to satisfy stringent testing criteria. Certain types of flexible material capable of with-

2

standing high impact loads without bursting, can be disposed within some or all of the walls of the building or other structure to provide continuous protection for the occupants and property.

Further, the invention contemplates the use of the synthetic textile as an enclosure within the building or structure. The enclosure could be free standing or incorporate one or more interior walls of the building or structure.

The invention also contemplates the use of the synthetic textile material deployed on the outside of buildings to cover small openings such as windows and doors.

Accordingly, it is an objective of the instant invention to teach the use of a synthetic textile within the walls of some or all of the rooms of a structure. The material may be disposed and secured between the inner finished wall and the sub assembly of studs or other support structure. In less expensive installations, the walls of a particular room, both inner and outer, may be reinforced to provide a safe room more resistant to missile impact than the rest of the structure.

It is a further objective of the instant invention to teach the use of a synthetic textile material which can be quickly mounted to fasteners in a wall and in the floor of a room to provide missile impact protection inside the room.

It is yet another objective of the instant invention to teach the use of a free standing enclosure of synthetic textile material within a structure. The enclosure is removably anchored to the supporting structure.

Other objects and advantages of this invention will become apparent from the following description taken in conjunction with the accompanying drawings wherein are set forth, by way of illustration and example, certain embodiments of this invention. The drawings constitute a part of this specification and include exemplary embodiments of the present invention and illustrate various objects and features thereof.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 shows an elevation of an interior room, partially in section, with reinforcements and the synthetic material installed;

FIG. 2 shows an elevation of an interior room with the synthetic material deployed;

FIG. 3 shows an elevation of a free standing enclosure of the synthetic material anchored within a structure;

FIG. 4 shows a cross section of a fastener for the edge of the synthetic material;

FIG. 5 shows a cross section of another fastener for the edge of the synthetic material;

FIG. 6 shows a cross section of another fastener for the edge of the synthetic material;

FIG. 7 shows an elevation of the synthetic material;

FIG. 8 shows an elevation of another free standing enclosure anchored within the structure;

FIG. 9 shows an elevation of a window with another free standing enclosure anchored thereabout; and

FIG. 10 shows an elevation of a window with the textile deployed

## DETAILED DESCRIPTION OF THE INVENTION

In FIG. 1 a portion of a structure 10 is shown with an outer wall panel 11, an inner wall panel 12, a stud or other subassembly 13, and the synthetic textile material of this

US 6,325,085 B1

3

invention 14. The textile material 14 is fastened to the subassembly 13 by any manner of mechanical or chemical fastening means, for example staples, nails or adhesive. The textile material may also be fastened to the interior wall in the same manner.

All the walls of the structure 10 may have the textile material 14 sandwiched between the wall panels. Although the textile is readily applied to the standard wall constructions, in order to maximize the benefits to the structure, each of the walls should have extra bracing and crossbracing. As shown in FIG. 1, the outer wall panel 11 is connected to an extra bracket 15 by bolt 16. The bracket is also connected to the floor pan 17 by bolts 18 and 19. The bracket 15 is connected to the subassembly 13 by bolt 20 and to the inner wall panel 12 by bolt 21. There would be similar brackets connecting the top edge of the inner and outer walls to the ceiling joists. The extra brackets would be spaced along the walls according to applicable building codes.

The interior wall 30 is shown having opposing wall panels 31 and 32 with brackets 34 and 35 anchoring the interior walls to the floor pan. Other similar brackets anchor the wall to ceiling joists (not shown). The textile material 14 is sandwiched between the panels. In some lighter constructions, there is no studding nor a subassembly in interior walls which necessitates fastening the textile material to each interior wall panel. In heavier construction there are studs or other subassemblies present between the interior wall panels, such as shown in the exterior wall in FIG. 1.

As shown in FIG. 1, the interior wall panels have extra brackets 34 and 35 which reinforce the connection between the interior walls and the floor pan. Brackets 34 and 35 are shown attached to the interior wall with bolts 36 and 37 and to the floor pan by bolts 38 and 39. These extra braces give the interior walls more strength than the normal manufacture. The brackets would be spaced along the interior walls as dictated by the underlying subassemblies and building codes.

A less expensive and lighter construction involves using the textile material and the extra bracing in the walls of only one room of the whole structure. The particular room selected for the reinforcement could be a living space, such as a bedroom, or a utility space, such as a bathroom or closet. In addition to the textile material sandwiched in the walls, in a preferred embodiment, the selected safe room would have the additional bracing and crossbracing, as shown in FIG. 1.

FIG. 2 shows another less expensive embodiment of the safe room. The textile material 14 is connected to an interior or exterior wall 40 near the ceiling of the room. Preferably, the textile material should be connected to an inner wall. As shown, the interior angle between the wall and the textile material is approximately 45 degrees. The angle may vary because of the limitations in the structure in which the textile material is used but the angle would always be acute. The slope of the textile material would serve to lessen the load placed on the material by debris falling from above. The angle between the wall and the material also determines the amount of space encompassed under the material. Considering an average adult to be about 6 feet tall and weigh about 170 pounds, such an adult sitting on the floor, with his back against the wall, would require approximately 3 feet in height, 3 feet in depth and 3 feet in width. Using a span of 8 feet for the textile material, ie. the hypotenuse of a right triangle formed by the interior wall, the floor and the textile material, as shown in FIG. 2, several adults can be accommodated. The distance, along the wall, that the textile material may deployed is limited only by the dimensions of

4

the structure. The wall 40 has a line of fasteners 41 mounted along the upper portion, approximately 5 feet above the floor, in recesses 49. These fasteners cooperate with fasteners 42 in the edge of the textile material. The fasteners 42 are constructed, as shown in FIG. 4, with loops 46 fixed to the material, rings 47 threaded through the loops and the base of the clamps 48. In FIG. 6 the edge of the textile material is formed as a tunnel 60 with a rod 61 disposed therein. At spaced intervals along the edge reinforced grommets 62 are formed exposing the rod for connection with the fasteners 41. The fasteners 41 may be eye bolts, as shown in FIGS. 4, 5 and 6, or hooks which are installed in the wall in such a manner as to have a failure limit higher than the burst strength of the textile material. Rather than eye bolts or hooks, the wall fasteners may be internally threaded holes which accept bolts mounted in the edge of the textile material. The material extends downwardly from the wall to another set of anchoring devices 43 located in the floor pan approximately 5 feet from the wall 40. The anchoring devices 43 may be threaded holes 44 which accept cooperating bolts 45 fixed in the edge of the textile material. The anchoring devices 43 may be formed in the same manner as the upper fasteners 42. The textile material 14 forms a lean-to shelter which provides a protected space for the occupants. The lean-to is preferably located on a continuous wall, without apertures, near a corner of continuous walls so that only one end of the lean-to is open. In this embodiment, it may be desirable for the textile material to be somewhat transparent.

A variation of the lean-to of FIG. 2 is shown in FIG. 10. The lean-to 90 is mounted to prevent direct impact of wind blown missiles onto the glass of window 88. The textile is secured by fastners 92 at the upper corners of the window. The bottom of the textile is mounted on extension fastners 96 at the bottom corners of the window. The length of the extensions 96 provide adequate space between the textile and the glass to decelerate missiles and prevent the glass from breaking.

It is desirable to have the wall 40 reinforced with extra bracing and cross bracing such as shown in FIG. 1. A complete enclosure 50 is shown if FIG. 3. The enclosure is fixed to the floor pan of the structure. The enclosure 50 has internal supports 51 and 52. These supports may be metal or plastic rods or the like, preferably, preformed in a bow shape. The ends 53, 54, 55, and 56 of the internal supports may be anchored to the floor pan with the fasteners such as shown in FIGS. 4, 5, and 6. The textile material 14 may have sleeves formed in the material to removably receive the supports 51 and 52. In another embodiment, the textile material may be placed over the supports and the peripheral edges of the textile material fixed to the floor pan by fasteners 57. The fasteners 57 may be formed in the same manner as the fasteners 41 and 42 shown in FIGS. 4, 5, and 6.

A structure similar to that shown in FIG. 3 is shown in FIG. 9. The window tent 80 is mounted to enclose the window 88 to prevent wind blown missiles from penetrating the glass. The textile material 89 is reinforced by the supports 84 and 86. The supports are bowed outwardly to provide space between the textile and the glass for deceleration of wind blown debris. The supports 84 and 86 are anchored at the corners of the window by fastners 82. Additional fastners 83 may be used to fix the sides of the window tent to the structure.

Another embodiment of a free standing enclosure is shown in FIG. 8. The vertical supports 70 hold up a ridge pole 71. The edges of the textile material are anchored to the

5

floor by fasteners 72 which are similar to the fasteners shown in FIGS. 4, 5, and 6. The textile material extends over the ridge pole 71 forming a tent—like structure.

The supports in FIGS. 3 and 8 are necessary to provide space for deceleration of debris between the periphery of the enclosure and the occupants. As stated above, a seated adult will require approximately 3 feet height. Therefore, the height of the enclosure should be at least 4 feet. The span of the textile material making up the sides of the enclosure should be approximately 8 feet from the apex of the enclosure to the floor.

FIGS. 4, 5, and 6 show different embodiments of the fasteners that are used to attach the flexible material to the inner or interior walls and floor of a structure. In all the fastener embodiments, the connection between the edges of the textile material and the fasteners has a higher failure strength than the textile material, itself.

FIG. 7 illustrates a preferred construction of the textile material 14 of this invention. A suitable material is polypropylene formed in a monofilament and woven into a geotextile (style 20458) manufactured by Synthetic Industries of Gainesville, Georgia. The fabric is woven in a basket (plain) weave, as shown in FIG. 7, where the fill threads and the warp threads alternately cross over and under adjacent fills and warps. While a woven material is shown, the material may be knitted, nonwoven or extruded with apertures formed therein. In the preferred embodiment, the interstices are substantially equal to 0.6 millimeter.

The selection of interstice size and configuration is dependent on the amount of transparency and air passage desired. Another consideration is the maximum size object that may penetrate the interstice. In some jurisdictions, it has been determined that wind blown debris of $\frac{3}{16}$th of an inch or less poses no threat. Therefore, the weave construction must prevent passage of debris $\frac{3}{16}$th of an inch or greater. Also, this textile material is approximately 95% closed which greatly reduces the velocity of the wind passing through the material. For example, the velocity of a 100 mph wind is reduced approximately 97% by passing through the material of this invention.

The preferred type of fabric will stretch approximately 20–22% just prior to failure, depending on manufacturing technique, and will fail under a force of approximately 675 psi.

With regard to the lean-to , shown in FIG.2, it is important to determine the distance between the wall and the fasteners securing the lower edge of the textile material to the floor. This space is necessary to decelerate a wind blown missile before ultimate failure of the textile material. The lean-to must include this amount of space, in addition to the amount of space required for the occupants, to insure that a missile will not strike someone inside the lean-to.

## EXAMPLE

Dade County, Fla.

In Dade County, Florida building codes require a flexible barrier to withstand a force of 61.3 psi before failure. To determine the stretch factor:

$$\frac{\text{test load}}{\text{maximum load}} \times \% \text{ stretch at maximum load} = \text{stretch factor}$$

Or

6

-continued

$$\frac{61.3}{675} \times 21 = 1.9\%$$

Assuming the room shown in FIG. 2 has an eight foot ceiling and the distance between the top edge and bottom edge of the lean-to is approximately 8 feet, the actual stretch will be:

stretch factor×height=actual stretch Or

96 in. X 1.9%=1.83 in.

To calculate deflection of the lean-to a right triangle is used such that the hypothenuse is ½ of the sum of the height plus stretch (96+1.83/2=48.92 in.) The known side is 96/2= 48 inches. Thus the deflection equals the square root of the difference between the square of the hypothenuse less the square of the known side or 9.4 inches. Therefore, the wall of the lean-to should be spaced approximately 9.4 inches from the area to be protected in order to decelerate a missile before failure. This means that the bottom edge of the lean-to should be about 9.4 inches from the inner or interior wall that holds the top edge plus the distance needed for the occupants.

The relationship between span and maximum deflection of the preferred textile material can be shown in a table:

| Height in feet | Deflection in inches |
|---|---|
| 8 | 9.4 |
| 10 | 11.8 |
| 12 | 14.1 |
| 14 | 16.5 |

These same type calculations can be used to determine the amount of space necessary inside the enclosure shown in FIG. 3. In any event, the size of the space beneath the lean-to or the enclosure will be many times the minimum deflection distance calculated here.

It is to be understood that while a certain form of the invention is illustrated, it is not to be limited to the specific form or arrangement of parts herein described and shown. It will be apparent to those skilled in the art that various changes may be made without departing from the scope of the invention and the invention is not to be considered limited to what is shown and described in the specification and drawings.

What is claimed is:

1. A flexible protective barrier device for protecting a portion of a structure from the force of wind and objects carried thereby, said structure including inner and outer walls circumscribing an enclosed space, a floor and a roof, said device comprising:
   a synthetic textile material connectable to said structure within said enclosed space, said textile material having a fail strength of at least 61.3 pounds per square inch and an ultimate stretch up to 22 percent, said textile material having interstices in the range of 0.6 to 4.8 millimeter.

2. A flexible protective barrier device of claim 1 wherein said outer wall and said inner wall are connected to said floor and said roof by a subassembly therebetween, said synthetic textile material adapted to be connected to said subassembly throughout said structure.

3. A flexible protective barrier device of claim 2 wherein said structure includes interior walls dividing the space circumscribed by said inner and outer walls, said synthetic textile material affixable to said interior walls.

US 6,325,085 B1

<table>
<tr><td>7</td><td>8</td></tr>
</table>

4. A flexible protective barrier device of claim 3 wherein said synthetic textile material is affixable to a portion of said interior walls.

5. A flexible protective barrier device of claim 2 wherein said synthetic textile material is connectable to said subassembly throughout a portion of said structure.

6. A flexible protective barrier device of claim 1 wherein said synthetic textile material is formed as a sheet having two opposing edges, one edge connectable to a wall and the other edge connectable to the floor, said sheet forming an acute angle with said wall.

7. A flexible protective barrier device of claim 1 wherein said synthetic textile material is formed as a sheet having two opposing edges, one edge connectable to a wall and the other edge connectable to the floor at least three feet from said wall.

8. A flexible protective barrier device of claim 1 wherein bow shaped supports are connectable to said floor, said synthetic textile material is disposed over said bow shaped supports and attached to said floor forming an enclosure.

9. A flexible protective barrier device of claim 1 wherein supports are connectable to said floor and said synthetic textile material is connected to said supports and said floor.

10. A storm survival kit for protecting a portion of the interior of a structure from the force of the wind and objects carried thereby, said kit comprising a textile material having a fail strength of between 61.3 and 675 pounds per square inch and interstices in the range of 0.6 to 4.8 millimeter, said textile material having at least two opposing edges, said edges having means for securing said textile material to said structure.

11. A storm survival kit of claim 10 including supports for said textile material, said supports having means for securing said supports to said structure, said textile material having more than two edges, said edges forming the periphery of an enclosed area, said edges having means for securing said textile material to said structure about said supports.

12. A storm survival kit of claim 11 wherein said supports are bow shaped.

13. A storm survival kit of claim 11 wherein said supports include vertical elements connected to a ridge pole.

14. A storm survival kit of claim 12 wherein said structure has at least one window and said supports extend diagonally across said window.

15. A storm survival kit of claim 10 wherein said structure has at least one window, said securing means in one of said opposing edges disposed above said window and said securing means in the other opposed edge disposed below said

window, said securing means in the other opposed edge disposed below said window having extensions.

16. A process for protecting an interior area of a structure from wind generated force and objects carried thereby, said structure having upstanding walls and a floor defining said interior area, comprising the steps of:

a) providing a textile material having a fail strength of at least 61.3 pounds per square inch and interstices in the range of about 0.6 to 4.8 millimeters,

b) determining an amount of space to be protected,

c) determining an amount of deflection necessary to decelerate a wind blown object before failure of said textile material, and

d) attaching said textile material to an interior portion of said structure at intervals about said space to be protected, said intervals selected such that said deflection of said textile material does not intrude into said amount of space to be protected before failure.

17. A process for protecting the interior of a structure of claim 16 including the step of mechanically attaching said textile material to the walls of said structure.

18. A process for protecting an interior area of a structure of claim 16 including the steps of:

a) providing a planar sheet having peripheral edges, said planar sheet having fasteners in two opposed edges,

b) attaching said fasteners of one edge to at least one of said upstanding walls, and

c) attaching said fasteners of said opposed edge to said floor.

19. A process for protecting an interior area of a structure of claim 16 including the steps of:

a) providing an enclosure of said textile material, said enclosure having peripheral edges, said edges having fasteners for securing said edges to said structure,

b) providing supports for said enclosure, said supports having fasteners for attaching said supports to said structure, and

c) attaching said supports to said structure and to said textile material to position said enclosure within said structure.

20. A process for protecting an interior area of a structure of claim 16 wherein said structure has windows, including the steps of; attaching said textile material to an exterior portion of said structure about said windows.

*  *  *  *  *

**EXHIBIT "C"**



US006176050B1

(12) **United States Patent**
Gower

(10) Patent No.: **US 6,176,050 B1**
(45) Date of Patent: **Jan. 23, 2001**

(54) **FLEXIBLE PROTECTIVE WIND ABATEMENT SYSTEM**

(76) Inventor: **Ted Gower**, 624 Riverside Rd., N. Palm Beach, FL (US) 33408

( * ) Notice: Under 35 U.S.C. 154(b), the term of this patent shall be extended for 0 days.

(21) Appl. No.: **09/270,249**

(22) Filed: **Mar. 15, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/861,209, filed on May 21, 1997, now abandoned.

(51) Int. Cl.[7] ............................................. **E04B 1/00**
(52) U.S. Cl. .................... **52/222; 135/90; 135/115; 135/119; 52/3**
(58) Field of Search ............................ 52/3.5, 23, 222, 52/DIG. 11; 135/88.81, 88.14, 90, 913, 115, 119, 903; 160/120

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,805,816 | * | 4/1974 | Nolte . |
| 3,862,876 | * | 1/1975 | Graves . |
| 3,949,527 | * | 4/1976 | Double . |
| 4,259,819 | * | 4/1981 | Wemyss ........................ 52/222 |
| 4,283,888 | * | 8/1981 | Cros . |
| 4,290,243 | * | 9/1981 | Mellin ............................. 52/63 |
| 4,487,212 | * | 12/1984 | Moore ............................ 135/90 |
| 4,590,714 | * | 5/1986 | Walker . |
| 4,848,386 | * | 7/1989 | Cooper ........................... 135/90 |
| 4,858,395 | * | 8/1989 | McQuirk . |
| 5,174,073 | * | 12/1992 | Sabo ................................. 52/3 |
| 5,319,896 | * | 6/1994 | Winger ........................... 52/23 |
| 5,347,768 | * | 9/1994 | Pineda . |
| 5,522,184 | * | 6/1996 | Oviedo-Reyes . |
| 5,531,239 | * | 7/1996 | Hannah ...................... 52/166 X |
| 5,579,794 | * | 12/1996 | Sporta ........................... 52/4 X |
| 5,687,512 | * | 11/1997 | Spoozak et al. ............... 52/23 |

* cited by examiner

*Primary Examiner*—Beth A. Stephan
(74) *Attorney, Agent, or Firm*—McHale & Slavin

(57) **ABSTRACT**

A device for protection of property against high winds constructed from a flexible screen of predetermined strength and stretch characteristics, and in the form of a curtain, utilized to protect the side of a structure including its windows and doors from the strong winds and debris impacts occurring during a hurricane. The device is anchored in a manner to space it out from the area being protected according to formula provided, and can safely dissipate substantial impacting energy. The preferred embodiment attaches to an overhanging eave and the ground below protecting in addition to the windows and doors, planters, outdoor furniture, decorative shutters, downspouts, and such as are enclosed behind the barrier. Several methods of storage and deployment of the device are described including rolling, sliding, and converting to awning. The barrier has the added feature of acting as a tie down in certain applications.

**8 Claims, 10 Drawing Sheets**





FIG. 1

FIG. 2

FIG. 3



*FIG. 4*

*FIG. 5*

*FIG. 6*



*FIG. 7*

*FIG. 8*



*FIG. 9*

*FIG. 10*



FIG. 11



FIG. 12                    FIG. 13



*FIG. 14*



*FIG. 15A*

*FIG. 15B*



*FIG. 15C*



FIG. 16

FIG. 17



*FIG. 18*



*FIG. 19*

US 6,176,050 B1

1

## FLEXIBLE PROTECTIVE WIND ABATEMENT SYSTEM

This application is a continuation-in-part application of a U.S. patent application filed on May 21, 1997. The parent application has the Ser. No. 08/861,209, now abandoned and the contents thereof are hereby incorporated by reference.

## FIELD OF THE INVENTION

This invention relates to the protection of property against high winds and, in particular, to a flexible protective barrier device for securing property against the force of winds and from impact of foreign objects carried by the wind as occasioned by hurricanes, tornadoes and the like.

## BACKGROUND OF THE INVENTION

As is known by one skilled in the art of protecting buildings and the like from damage caused by missile-like objects that are occasioned by the heavy winds of hurricanes or tornadoes, there are commercially available variations of hurricane protective devices, often called shutters, that fasten immediately over the frangible area to be protected. These devices are typically expensive to purchase, cumbersome, made from stiff, heavy material such as steel and aircraft quality aluminum alloy or occasionally plastic with reinforcing. Many need to be manually connected and then removed and stored at each threat of inclement weather. Many require unsightly and difficult-to-mount reinforcing bars at multiple locations. Further, these known shutters are usually opaque, preventing light from entering a shuttered area and preventing an inhabitant from seeing out. Likewise, it is desirable that police be able to see into buildings to check for inhabitants and to prevent looting which can be a problem in such circumstances. Missiles, even small not potentially damaging missiles, striking these heretofore known shutters create a loud, often frightening bang that is disturbing to inhabitants being protected.

Standardized testing requiring these protective devices to meet certain standards of strength and integrity has been introduced for various utilizations and locales. In order to qualify for use where testing requirements apply, the strength and integrity characteristics of these protective devices must be predictable and must be sufficient to meet mandated standards. Additionally, it is beneficial to qualify for these standards even in situations in which standards do not apply. As a result of these standards, many undesirable aspects of the previously-known shutters have been acerbated. They have become more cumbersome, more bulky, heavier, more expensive, more difficult to store, and remain generally opaque and noisy when impacted. To incorporate sufficient strength to meet said requirements, weight and bulk become a problem over six feet in span. The useable span (usually height) of the heretofore known shutters that meet said standards may be limited to eight feet or less. This makes protecting large windows, for example, or groupings of windows, with the heretofore known devices cumbersome, expensive and impractical. Devices that are intended to be deployed in a roll down manner either manually, automatically, or simply by motor drive, have been difficult to strengthen sufficiently to pass the test requirements and require unsightly reinforcing bars every few feet.

Prior to the introduction of said standards, an ordinary consumer had very little knowledge of the strength and integrity of said shutters. It is believed shutters of the pre-standard era were very weak such that all would fail the

2

present standardized testing. It should be understood that the standards are not intended to provide a shutter that will protect in all situations. As the hurricane conditions can be very violent and destructive, the standards are not intended to require strength and integrity sufficient to protect in all circumstances. The standards simply provide a benchmark as to strength and integrity. Said strength and integrity of the shutters can now be measured.

There are many patents that teach the utilization of knitted or woven fabric such as netting, tarpaulins, drop cloths, blankets, sheets wrapping and the like for anchoring down recreational vehicles, nurseries, loose soil and the like. But none of these are intended for, nor are capable of withstanding the forces of the missile-like objects that are carried by the wind in hurricanes.

Some protection devices have internal stiffness and rigidity that resists deflection, or bending. In rigid protection devices, it is stiffness that stops the missile short of the frangible surface being protected.

Other protection devices use fabric or netting material to cover a unit to be protected. Typically, the device completely covers the unit, and edges of the fabric are fastened to the ground. Examples of fabric-employing devices are shown in the following patents: U.S. Pat. Nos. 3,862,876 issued to Graves, 4,283,888 and 4,397,122 issued to Cros, 4,858,395 issued to McQuirk, 3,949,527 issued to Double et al., 3,805,816 issued to Nolte, 5,522,184 issued to Oviedo-Reyes, 4,590,714 issued to Walker and 5,347,768 issued to Pineda. The 5,522,184 patent for example, provides a netting that fits flush over the roof of a building and uses a complicated anchoring system to tie down the netting.

Typical of known flexible, fabric-employing protection devices is the characteristic of substantial wind-permeability. For example, U.S. Pat. No. 5,579,794, issued to Sporta, discloses a wind-permeable perforate sheet that extends downwardly and outwardly from the top of the object to be protected at an acute angle so as to surround a substantial portion of each of the sides with an inclined wind-permeable planar surface. The Sporta device, for example, discloses protective barriers that are from 50% to 90% open. With this type of device, any reduction in wind reaching the covered structure will be slight. The Sporta device may be effective in reducing damage otherwise caused by the impact of some debris. However, the substantially-wind permeable nature of the Sporta device makes this type of protective barrier a ineffective at reducing damage caused by the wind, itself.

Thus, what is lacking in the art is a flexible protective barrier constructed from a mesh material that can be easily stored and deployed for protecting the frangible portion of a structure not only from objects carried by the wind, but also from the force of the wind itself.

## SUMMARY OF THE INVENTION

This invention contemplates the use of a flexible barrier, preferably a reasonably transparent, woven synthetic textile that is able to satisfy stringent testing requirements. Certain types of flexible material capable of withstanding high impact loads without bursting, can be disposed in front of the building or other structures intended to be protected, and anchored on opposing edges, to form a curtain sufficiently spaced from the frangible area to contain the impact of foreign objects hurled by the high winds. When used with a building, for example, the top edge of the fabric may be anchored to the eave of the roof and the bottom of the fabric may be attached to anchors imbedded in the ground or

3

cement, so as to present a curtain adequately spaced out from and in front of the structure of the building to be protected. Not only does this afford frontal protection but, properly located and attached, it also serves to tie down the roof and protect it from blowing off. The winds that would ordinarily blow off the roof exert a force on the fabric which, in turn, exerts a downward force on the roof to act against the lifting forces tending to lift the roof. Knitted or extruded material can be used if the material itself meets the criteria described later herein.

The device provides a barrier that is substantially impermeable to wind. Although air travels through the barrier, the barrier is approximately 95% closed, and the velocity of wind passing through the device is greatly reduced. For example, the velocity of a 100 mph wind is reduced by approximately 97% by passing through the wind abatement system of the present invention. The wind abatement system of the present invention substantially reduces the force of wind passing through the device and also provides a barrier against wind-borne missiles having diameters of approximately 3/16 inch in diameter or larger.

The ability to provide protection from wind forces and solid debris in a flexible device represents a step forward in this field. In fact, the Miami-Dade County, Fla. region has, after seeing the present invention, begun creating a new category of protective devices. The Miami-Dade County region is recognized as a leader in the field of hurricane-protection-related standards, and creation of this new category will likely result in modifications of the existing regional building code, including new standards promulgated to regulate this type of device.

The use of this invention allows very large areas with spans of greater than 25 feet to be covered with ease. Thus most window groupings, even several stories of a building, could be readily protected. This invention is light in weight, easy to use, does not require reinforcing bars, can be constructed in varying degrees of transparency, can be weather tight, is economical, and is capable of dissipating far greater forces without damage than stiff devices. Missiles striking this barrier make very little sound. Additionally, this invention is suitable to be configured with the necessary motor and supportive devices for automatic deployment.

This invention does not have rigidity but rather is very flexible, which gives several positive features including allowing for ease of storage as by rolling or folding. The flexible barrier of the invention is placed a distance out from the surface to be protected. An impacting missile stretches the barrier until it decelerates to a stop or is deflected. The barrier material has a predetermined tensile strength and stretch that makes it suitable for this application. Said known strength and stretch, together with the speed, weight and size of the impacting missile, all of which are given in test requirements, permit design calculation to ascertain barrier deflection at impact. This deflection is a determinate of the minimum distance that this barrier is to be spaced out from the frangible area to be protected. Other determinates which may be included are additional deflection from wind pressure and from slack from an improper installation.

The barrier of this invention is mounted farther away from the surface to be protected than the prior art structures, thereby providing room for a longer deceleration of impacting flying debris (missiles). Thus greater energy from a missile can be safely dissipated than is possible with the prior art structures, and the energy which can be safely dissipated is calculable.

I have found that the distance which the barrier is spaced out from the frangible surface need not be great and is quite

4

workable. Even though the distance is not great, said distance does allow a significantly increased distance and time of deceleration such that the barrier will stop far stronger impacts than with the heretofore known rigid devices. In simple terms, the missile is slowed to a stop by elasticity as the barrier stretches. The greater the impact, the greater the stretch. Thus the building is not subjected to an abrupt harsh blow as the impact on the shutter is transferred to the building. The energy transfer is much gentler and less destructive than with the rigid devices.

This device goes beyond merely hanging a curtain in front of a structure and hoping wind born missiles will be stopped. This invention provides a method of calculating the minimum spacing of said barrier from the frangible surface and provides understanding as to the strength and integrity of said barrier. This invention employs a screen-like fabric with interstices that permit the light to pass through and that is reasonably transparent. Of course, if interstices are utilized in the fabric makeup, the size of the interstices must consider the size of the missiles such that the missiles do not pass therethrough. If transparency is not desirable, the fabric can be made sufficiently dense to minimize or eliminate the interstices. To assure a long life, the material of the fabric preferably would be resistant to the ultra violet radiation, and to biological and chemical degradation such as are ordinarily found outdoors. This invention contemplates either coating the material or utilizing material with inherent resistance to withstand these elements. A synthetic material such as polypropylene has been found to be acceptable. An example of a coated material is vinyl coated polyester. Materials intended to be used outdoors in trampolines, for example, are likely candidates for use in this invention. Black colored polypropylene is most resistant to degradation from ultra violet radiation. Other colors and vinyl coated polyester are sufficiently resistant, particularly if the barrier is not intended to be stored in direct sunlight when not in use.

The preferred embodiment allows air passage through it, albeit at substantially reduced rate. An upwind pressure of 1" of mercury, which roughly translates into a 100 mph wind, forces air through at 250 cfm or approximately 3 mph. The amount of air passage depends on the interstice size. If a weather tight and transparent barrier is desired, the polypropylene material may be laminated with a flexible clear plastic skin.

It is of importance that the material affords sufficient impact protection to meet the regulatory agencies' requirements in order for this to be a viable alternative to other hurricane protective mechanisms. While stiff structures, such as panels of metal, are easily tested for impact requirement and have certain defined standards, fabrics on the other band, are flexible and react differently from stiff structures. Hence the testing thereof is not as easily quantified as the stiffer materials. However, certain imperial relationships exist so that correlation can be made to compare the two mediums. Typically, the current impact test of certain locales requires a wood 2x4 stud be shot at the barrier exerting a total force of approximately 230 pounds, or 61.3 psi, over its frontal (impacting) surface. This impact and resultant force relate to the Mullen Burst test commonly used by manufacturers to measure the bursting strength of their fabrics. Thus the impact test heretofore used on rigid devices will work equally well on this flexible device.

The preferred embodiment of this invention would use a textile of the type typically used in trampolines which would burst at 675 psi or a total of 2,531.25 pounds over the same 3.75 square inch frontal surface of the nominal 2x4 test

US 6,176,050 B1

5

missile and would stretch 21% immediately prior to failure. The strength and stretch characteristics of the material are known. The strength of this fabric is more than eleven (11) times the 230 pounds of strength required to withstand the above-described 2x4 missile test as presently required by said regulatory agencies. Stronger fabrics are available. Others are available in various strengths, colors and patterns. The maximum deflection can readily be calculated and hence the distance that the fabric must be spaced from the surface being protected can be easily ascertained.

As one skilled in this art will appreciate, the reason for the utilization of stiff materials for protection against the high winds and missile-like objects propelled thereby is because heretofore known barriers are mounted close to the frangible object being protected. Unfortunately, if the protective material is mounted close to the protected surface, it must necessarily be stiff in order to stop the missile short of the protected frangible surface. In such a situation, impacting missiles are required to come to an abrupt stop. Such abrupt stop of the missile on impact with the surface of the protecting structure is less desirable because the rapid energy dissipation has the propensity to cause damage not only to the protective device, but to the structure being protected as well. An extended, controlled deceleration is not available if the barrier is mounted close to the frangible surface.

The use of flexible fabric distanced out from the frangible area as a protective barrier allows extended deceleration. When the strength and stretch properties of the fabric are known and allowed for, the extended deceleration becomes controlled. By mounting the protective barrier some distance from the frangible surface, a distance that is calculable, the missile can be decelerated to a stop prior to contacting the frangible surface. In other words, in any situation where the missile must stop prior to impacting the frangible surface being protected, it is desirable to decelerate the missile through an extended, controlled deceleration. This invention does precisely that.

An extended deceleration has much less propensity to cause damage than an abrupt deceleration. Since the use of a flexible material as a protective barrier affords an extended deceleration, very strong impacts can be withstood. It is contemplated that this invention, using the proper material and the proper assembly, will be sufficient to meet all foreseeable impact test requirements and regulations for wind and debris protection. Such requirements and regulation would include more severe tests being contemplated for specialized, high protection, shelters.

Thus, an object of this invention is to provide a barrier made from fabric to protect the frangible portions of a building and the like from the force of wind and impact from wind-borne debris. A feature of this invention is spacing the barrier out from and in front of the frangible area to be protected by attaching two opposing edges to anchors located so as to position the barrier as described. Another feature is the formula for calculating minimum spacing.

For example, one edge of the fabric can be anchored to the overhang of the roof or other high structure and the opposite edge of the span to the ground or low structure to provide a barrier spaced from and in front of the object to be protected. The lower anchors can be attached to the ground by imbedding in cement or other ground attachment such as tie downs or stakes and the like and providing grommets, rings or other attachments in the fabric to accept a clamp, cable, rope, and the like. The barrier is sufficiently spaced from the structure being protected in order to absorb and dissipate the energy

6

from impact prior to the impacting object reaching the structure. The deceleration of the impacting object is extended in comparison to a stiff barrier.

The curtain-like barrier of this invention is characterized as a reasonably transparent barrier with strength and simplicity that is unattainable with the heretofore known barriers. Impact by a missile does not cause a large bang, and is not disturbing. It is easy to install, requires low maintenance and has low acquisition cost. There is much flexibility with storage. It can either be left in place or rolled back as a shade, or slid out of the way much as a curtain, so as not to obstruct the translucent of the window or interfere with the aesthetics of the building. It can also be fully removed and stored out of the way, or swung up to form a canopy when not in use as a protective barrier. It is preferable but not essential, that the material selected to be used in the netting fabric of this invention be inherently resistant to elements encountered in the outdoors or can be coated with coatings that afford resistance to these elements.

Another feature of this invention is that it is capable of providing the dual function of protection against flying missiles as well as providing anchoring capabilities, such as tying down the roof of the building or structure being protected to prevent it from being lifted off.

Another feature of this invention is that it can be reasonably transparent if desired without adversely affecting the integrity of the barrier.

Another feature of this invention is that missile impact is reasonably quiet and not a loud, frightening bang as with heretofore known rigid devices.

Other objects and advantages of this invention will become apparent from the following description taken in conjunction with the accompanying drawings wherein are set forth, by way of illustration and example, certain embodiments of this invention. The drawings constitute a part of this specification and include exemplary embodiments of the present invention and illustrate various objects and features thereof.

BRIEF DESCRIPTION OF DRAWING

FIG. 1. is a partial view in perspective and schematic illustrating this invention in the deployed position and attached to the eave of a building;

FIG. 2 is a partial view in section illustrating mechanism for tying down the protective barrier;

FIG. 3 is a partial view in section illustrating another tie-down mechanism as shown in FIG. 4;

FIG. 4 is a detailed showing of alternative mechanism for attaching the tie-down mechanism to the barrier;

FIG. 5 is a partial view illustrating a sample plain weave pattern of fabric used in the barrier;

FIG. 6 is a diagrammatic and schematic view illustrating the barrier as shown in FIG. 1 partially rolled up;

FIG. 7 is a view in perspective illustrating the invention being utilized to encapsulate a deck or porch particularly such as are found in high rise buildings;

FIG. 8 is a fragmented top plan view of the embodiment depicted in FIG. 7 with the barrier retracted for storage;

FIG. 9 is a view in elevation and section taken along lines 9—9 of FIG. 8 but with the barrier deployed;

FIG. 10 is a view in section taken along the lines 10—10 of FIG. 9 showing end view of roller/track mechanism;

FIG. 11 is an enlarged side view illustrating the details of the roller/tie down mechanism in FIG. 10;

7

FIG. 12 is a partial view in section taken along lines 12 – 12 of FIG. 9 utilizing a channel mechanism to attach a side of the curtain to a wall;

FIG. 13 is the same view as FIG. 12 utilizing a batten attaching mechanism;

FIG. 14 is an enlarged view illustrating mechanism for attaching the ends of the barrier to permit the barrier to be opened and stored;

FIG. 15A is a partial view in perspective and schematic exemplifying another embodiment of this invention, including a section of clear vinyl laminated to the screen, providing a weather-tight barrier;

FIG. 15B is a side view of the FIG. 2 enlargement of the ring attachment to the ground as in FIG. 15A, including an extended apron of fabric;

FIG. 15C is a partial view in perspective of the embodiment shown in FIG. 15A but spanning several stories of a building rather than one story as in 15A;

FIG. 16 is an enlargement of the upper attachment in FIG. 15A;

FIG. 17 is a schematic view of FIG. 15B and including a type of ground anchor;

FIG. 18 is an enlargement example of a fastening system using hook and loop method to attach adjacent sections of barrier one to the other, particularly when they meet at an angle to each other; and

FIG. 19 is an enlargement example of a hook and eye method of attaching adjacent sections of barrier.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

It is to be understood that while a certain form of the invention is illustrated, it is not to be limited to the specific form or arrangement of parts herein described and shown. It will be apparent to those skilled in the art that various changes may be made without departing from the scope of the invention and the invention is not to be considered limited to what is shown in the drawings and described in the specification.

This invention uses flexible material that has known qualities of strength and stretch and is sufficiently strong to withstand applicable impact testing. The invention does not derive its strength from stiffness or rigidity but rather from its bursting strength and stretch, with the latter acting like a spring to gradually decelerate any impacting missile. To be able to calculate the minimum distance that the barrier must be placed out from the area to be protected, the frontal area, weight and speed of the test missile must also be known. Wind speed may become a significant factor in large spans. The generic barrier needs only these requirements.

There are many desirable characteristics of this invention such as transparency, resistance to weathering, lightweight, ease of installation, deployment and storage, economy. Additionally, there are several methods of deploying and storing this barrier.

While this invention is shown in its preferred embodiment as being utilized to protect the windows and overhang roof of a structure, it is to be understood that this item has utility for other items requiring protection and is applicable to other types of structures. Where appropriate, the barrier can be deployed horizontally or at any angle as well as the vertical as shown in FIG. 1.

Reference is now made to FIGS. 1–6 which partially show a building structure 10 including a cement patio 20 and

8

windowed sliding doors 18 intended to be protected from the onslaught of winds and debris typically occasioned during a hurricane. In this particular disclosure the building includes an overhang roof and a cement patio. According to this invention the top of a curtain panel or barrier 14, made from a textile woven of a suitable fiber, (other weaves or knits may be used) is attached to roof 16 and the bottom thereof is attached to the patio 20. A suitable material is polypropylene formed in a monofilament and woven into a geotextile (style 20458) manufactured by Synthetic Industries of Gainesville, Ga. The fabric is woven in a plain weave as shown in FIG. 5 where the fill 11 and warp 13 threads alternately cross over and under adjacent fills and warps. In the preferred embodiment the interstices are substantially equal to 0.6 millimeters which approximates the interstices of commercially available residential window screening.

The selection of interstice size and configuration is dependent on the amount of transparency and air passage desired and the limitation that the maximum size must be sufficiently small to prevent objects that are potentially damaging on impact from passing therethrough. The above-mentioned regulations, set in place by Miami-Dade County, Fla., have determined that the smallest diameter missile (wind blown debris) with which they are concerned is $\frac{1}{16}$ inch in diameter. Therefore to satisfy the Dade County Regulations the interstices must be small enough to prevent $\frac{1}{16}$ inch diameter missiles from passing therethrough. Other regulations may set other minimum missile diameter sizes, and the interstice size would vary accordingly if new standards were to be met.

The endurance, physical, hydraulic and mechanical properties of the textile are recorded and available from the manufacturer, Synthetic Industries. It is important to this invention that whatever type of material is utilized, the fabric made up from this material must exhibit sufficient impact strength for resisting the test impact loads at least to the values dictated by the various industrial, insurance and government regulating agencies. This particular fabric has been shown to be able to withstand at over 11 times the test load required by the regulating agency presently in the forefront of standard setting. In one embodiment, the material used is approximately 5% open.

The material selected must meet certain strength criteria. These criteria, together with the size of span covered by the barrier, constitute the basis for calculating the spacing of the barrier from the object being protected. Said spacing is calculated as follows:

1) The fabric must be sufficiently strong that the impact force it is required to withstand is less than the failure force (Mullen Burst).

2) The impact (test) force is then divided by the force required to cause failure (Mullen Burst). This quotient is then multiplied by the known stretch at failure to obtain the stretch factor. The woven polypropylene synthetic fabrics of the type used in the preferred embodiment stretch 20–22% just prior to failure, depending on manufacturing technique. This stretch information is available from the manufacturer.

3) The actual stretch measurement is then calculated and in conjunction with the span of the barrier used to ascertain the maximum deflection. This maximum deflection is the minimum distance the barrier should be spaced from the frangible object being protected.

## EXAMPLE

The preferred embodiment is used as an example to demonstrate this formula. The preferred embodiment is a

9

polypropylene, woven monofilament geotextile. The individual filaments are woven into a basket weave network and calendered so that the filaments retain dimensional stability relative to each other. This geotextile is resistant to ultra violet degradation and to biological and chemical environments normally found in soils. This fabric is often used as the mat for outdoor trampolines and is intended to be very resistant to weathering. The fabric is known to stretch a maximum of 21% prior to failure and requires a force of 675 psi to fail.

1. The present test that was originally legislated by Dade County Fla. and may become the standard in the industry, requires the barrier to withstand a force of only 61.3 psi. Consequently the fabric meets and exceeds the first requirement of strength.

   1. The stretch factor calculation is (test load/maximum load×% stretch at maximum load=stretch factor) 61.3/675×21=1.9%. This becomes a constant factor insofar as this fabric and the Dade test remain involved. The calculation will change if any one or more of the strength, energy or stretch characteristics of the test or fabric are modified. Likewise, it is known that stretch varies directly with force up to the maximum at failure. To calculate the actual stretch, the calculation is stretch factor×height=actual stretch. Therefore if the distance between the two fastened sides is eight feet (96 inches), the stretch measurement will be 96×1.9%=1.83".

   2. To calculate the deflection, right triangles are used such that the hypotenuse is ½ of the sum of the height plus stretch (97.83/2=48.92"). The known side is ½ of the height (96/2=48"). Thus the deflection=the square root of the difference between the square of the hypotenuse less the square of the known side. This result is 9.4" which is the maximum deflection on impact by test missile.

   3. Thus to meet the prescribed standard the barrier must be mounted so as to be spaced at least 9.4 inches from the surface to be protected if an eight (8) foot span is to be used. A longer span will require wider spacing, a shorter will require less. The table shown below reflects this spacing for various sample distances of span with this preferred fabric.

Table demonstrating relationship between

Span and Maximum Deflection in the Preferred Embodiment as Described Above.

| Height | Deflection |
|--------|-----------|
| 8 feet | 9.4 inches |
| 10 feet | 11.8 inches |
| 12 feet | 14.1 inches |
| 14 feet | 16.5 inches |
| 16 feet | 18.8 inches |
| 18 feet | 21.2 inches |
| 20 feet | 23.5 inches |
| 22 feet | 25.9 inches |
| 24 feet | 28.2 inches |
| 30 feet | 35.2 inches |
| 40 feet | 47.0 inches |

The aforementioned formula is sufficient to provide spacing to meet the test standards. As the spacing is intended to be minimum, and although the barrier is intended to meet or exceed test standards as opposed to warranting protection in actual situations which are difficult to predict, this invention can include an additional factor in the spacing to allow for

10

maximum wind pressure. Arbitrarily assuming a 115 mph wind at 90 degrees to the barrier and assuming the barrier has been made weather tight with no air flow through the barrier to somewhat relieve pressure, and assuming the barrier is installed at sea level where air is densest, the additional pressure on the barrier will be 0.237 pounds per linear inch of span. This additional pressure can be resolved into a vector and added directly to the test force of 61.3 pounds. Thus an 8 foot barrier will have an additional (0.237×96=) 22.75 pounds added for a total of 84.05 pounds. A 40 foot barrier will have (0.237×480=) 113.76 pounds added for a total of 175.06 pounds. This number should be substituted into the above formula to give a more accurate calculation of minimum spacing.

For example: an 8 foot barrier could deflect 10.9" when allowing for a 115 mph wind factor rather than 9.7" if the wind was not factored in. The deflection of a 40 foot barrier becomes 80.28" (6.69') rather than 47" (3.9').

Once the minimum space between the barrier and the structure being protected is established, the fabric must be anchored in a suitable manner so as to absorb the loads without being torn from its support. As shown in FIG. 1 the protective barrier may be attached to a batten 15 that is attached to the eaves 16 of the roof 17 by suitable threaded bolts or screws 25 or the like. The batten attaching method allows for ease of installation as the installer can wrap the material around the batten as necessary to adjust the span relative to the span and then attach the batten to the building. Additionally, the use of a batten allows the edge of the barrier to be securely fastened overhead in a simple and economical method. Other methods are available in appropriate situations. The lower edge is fastened by anchors set in recesses 22 formed into the cement to bury or partially bury eyebolts 24. The eyebolts 24 are permanently screwed into the remaining portion of the cement. This invention contemplates other methods of anchoring the top and bottom of the curtain panels depending on the particular application. The sides of the panels, where appropriate, can likewise be anchored. The panels may also be fabricated with a selvage or hem or can utilize a reinforcing tape such as "Polytape" that is made from a polypropylene material. The selvage or tape may include commercially available grommets or rings to accept the tie-down hardware. The attachment ring 30 carries a self-locking clamp 32 adapted to fit the eyebolt 24 to tie down the curtain. In FIG. 3 clamp 32 captures a rod 38 and clamps to the eyebolt 24. In the embodiment shown in FIGS. 3 and 4, the clamp 32 is fitted to a sturdy rod 38 running the length of the bottom edge of the barrier that is secured in the hem formed by folding the material of the curtain as shown. In FIG. 4 the end cap 40 can serve as a glide in a track if end tracks (not shown) are desired for raising and lowering the barrier. An automatic deployment system could require such end tracks. The same reference numerals depict like parts in all the Figs. Commercially available grommets or attached rings 30 may be utilized to hold the clamp 32. In this manner the curtain is anchored via the clamp 32 and eyebolt 24. Rod 38 may include an end cap 40 mounted on the end thereof to prevent the rod from falling out of the loop of the curtain. One method of rolling up the curtain in order to move it out of the way when not in use is shown in FIG. 6. As shown in FIGS. 1 and 6 the curtain carries a pull cord 28 that is looped around the end of the barrier. As noted in FIGS. 1 and 6, the cord 28 is attached to the eave of the roof by a standard eye bolt 50 and is wrapped around the end of the curtain and passed through a suitable pulley 52, also attached to the eave. Multiple apparatuses of this nature would be needed for a long run of

11

barrier. All would be controlled from one position much like similar existing blind roll up mechanisms. The free end freely hangs and allows the operator to pull or release it to roll up or let down the curtain as required. Ideally the deployed curtain should only be sufficiently taut to remove slack If during the installation slack is left this should be allowed for in calculating the said minimum spacing

FIGS. 7–14 exemplify another embodiment where the invention may be used to enclose a porch or deck where there is a floor 74 and parallel ceiling 73. In this embodiment the curtain 75 rides on rails 76 of any sturdy well-known commercially available type. An example of a rail and glider is disclosed in FIG. 10 where the glider 70 fits into a top and bottom rail or track 76 which is suitably attached to the ceiling 73 and cement floor 74. The attachment may be by insert and bolt 80, as shown. A similar attachment for rail and glider is utilized on the ceiling. The top and bottom of the curtain panels are attached to the glider by a suitable tape 81 that is fitted through the eyelet 82 and looped to form a loop which is sewn into the curtain panels in a well known manner and in a butterfly pattern. The edges at the top and bottom of each panel of the curtain are folded over one or two times to assure the structural integrity of the panels. The side edges of the curtains may be suitably attached to the siding of the building as by FIG. 13 in which the material is wrapped around a batten 15 which is in turn fastened to the wall with appropriate screws 90. In this instance the screw 90 fits into inserts 92 as would be done in cement. An alternate fastening is shown in FIG. 12. A rope 93 is fitted into a hem formed at the end of the barrier and fits into a partial circular channel 95 formed on the end of the frame that is anchored to the wall of the building and secures the barrier into the channel.

The abutting ends of the curtains are fitted into an elongated closure panel with a female fitting 100 and male fitting 102 as shown per FIG. 14 for closing the curtains in a similar manner as is done with the sliding doors. The latches 104 on the male fitting fit into the female slots 106 and an arm 98 attached to handle 101 is supported to move rectilinearly for securing the panels in a locked position. Alternative end fastenings are shown in FIGS. 18 and 19 wherein the ends are overlapped and secured one to the other using hook and loop tape (FIG. 18) or spaced hook and eye attachments (FIG. 19).

FIGS. 15A, 15B, 15C, 16 and 17 exemplify another embodiment of this invention wherein the curtain 14 may be mounted on a slant. The bottom of the curtain 14 may be anchored into the ground as shown by the stakes 110. The ground anchor stakes 110 shown are of a commonly available type often used to anchor sheds or telephone poles. As seen in FIG. 17 a suitable clamp 112 tied to barrier 14 is clamped onto the eyelet 116 of stake 110. FIG. 16 discloses another mechanism for tying the barrier 14 to the roof of the building. In this embodiment the fabric is wrapped around the sturdy batten 15 that is lag bolted or screwed to joists or other sturdy feature. This is essentially the same mechanism that is shown in FIG. 12, but is overhead rather than on a wall. Tape 126 may be sewn or glued to the top edge of the barrier 14 for greater strength where it wraps the batten. This would provide reinforcement in the event of a span covering several stories.

FIG. 15C shows an embodiment of this invention in which the barrier is deployed on a slant and is covering several stories of a building. Deployed in this manner the barrier serves to provide protection from wind blown missiles for the frangible parts of the building and additionally for automobiles parked thereunder. FIG. 15C could accept

12

the barrier rolled and stored on the roof of the building as a very convenient installation. The method of deploying and storage could be as in FIG. 1. The barrier need not be spaced out from the building if the frangible portions, such as windows are inset sufficiently as is often the situation

What is shown by this invention is a simple, adaptable, transparent, economical, and aesthetically pleasing device that is suitable to protect the building, doors and windows from the forces of winds occasioned by hurricanes and the debris carried by the winds. The textile barrier can either be removed and stored in a very simple manner without requiring a lot of space or could remain installed and either rolled, swung or slid out of the way.

Although this invention has been shown and described with respect to detailed embodiments thereof, it will be appreciated and understood by those skilled in the art that various changes in form and detail thereof may be made without departing from the spirit and scope of the claimed invention.

What is claimed is:

1. A flexible protective barrier device for protecting a frangible portion of a structure from the force of wind and objects carried thereby, said device comprising:

a flexible screen having a predetermined strength and being characterized by interstices, said interstices being constructed and arranged so that said screen substantially reduces the velocity of wind passing through said interstices;

a first anchoring means for attaching said screen to an overhanging boundary of said frangible portion, said overhanging boundary extending from said structure;

a second anchoring means for attaching said screen to an underlying boundary of said frangible portion, said second anchoring means cooperating with said first anchoring means to selectively maintain said screen in a use orientation;

whereby when said screen is in said use orientation, said first and second anchoring means maintain said screen in a spaced apart relationship with said frangible portion, thereby allowing for deceleration of objects impacting said screen;

said first anchoring means includes a rigid strip for extending laterally along a mounting surface of said overhanging boundary, said strip being positioned to maintain a first mounting edge of said screen against said mounting surface;

at least one fastening member constructed and arranged to secure said strip to said overhanging boundary;

said second anchoring means includes at least one fastening member adapted to link said second mounting edge of said screen with said underlying boundary when said screen is in said use orientation;

a support means for adjustably positioning said screen second mounting edge with respect to said underlying boundary, said support means includes at least one pulley for mounting on said overhanging boundary;

and at least one corresponding flexible member operatively associated with said pulley, said flexible member having a first end for attachment to said overhanging boundary and a free second end, said first and second ends being spaced apart by a middle portion, said middle portion adjustably supporting said pole,

whereby when said second end is pulled with respect to said pulley, said middle portion travels about said pulley, thereby producing vertical motion of said pole and said screen second mounting edge.

13

2. The flexible protective barrier device of claim 1, wherein the velocity of said wind at a leeward side of said screen is approximately 2.5% to 3.5% of the velocity of said wind at a windward side of said screen;

whereby the velocity of wind passing through said screen is reduced by approximately 97%.

3. The flexible protective barrier device of claim 2, wherein each of said interstices have a surface area small enough to stop a missile having a diameter of 3/16 inch.

4. The flexible protective barrier device of claim 1, wherein:

said first anchoring means includes a first track for being disposed along said overhanging boundary; and at least one connector member attached to a first mounting edge of said screen, said at least one connector being constructed and arranged to slidably engage said first track; and

said second anchoring means includes a second track for being disposed along said underlying boundary; and at least one connector member attached to a second mounting edge of said screen, said at least one connector being constructed and arranged to slidably engage said second track.

5. The flexible protective barrier device of claim 4, wherein:

said flexible screen includes a first half being characterized by a first connector disposed along a first linking edge, said first connector having at least one linking aperture; and a second half being characterized by a second connector disposed along a second linking edge, said second connector having at least one linking member adapted to selectively engage said at least one linking aperture;

whereby when said at least one linking member engages said at least one linking aperture, said screen halves cooperatively form a substantially contiguous expanse of material.

6. The flexible protective barrier device of claim 1, wherein:

said second anchoring means includes a rigid pole disposed along a second mounting edge of said screen; at least one fastening member adapted to link said pole with said underlying boundary when said screen is in said in use orientation.

7. The flexible protective barrier device of claim 6, wherein said at least one fastening member is a soil engaging-engaging anchor.

14

8. A flexible protective barrier device for protecting a frangible portion of a structure from the force of wind and objects carried thereby, said device comprising:

a flexible screen having a predetermined strength;

a first anchoring means for attaching said screen to an overhanging boundary of said frangible portion, said overhanging boundary extending from said structure;

a second anchoring means for attaching said screen to an underlying boundary of said frangible portion, said second anchoring means cooperating with said first anchoring means to selectively maintain said screen in a use orientation;

whereby when said screen is in said use orientation, said first and second anchoring means maintain said screen in a spaced apart relationship with said frangible portion, thereby allowing for deceleration of objects impacting said screen;

said first anchoring means includes a rigid strip for extending laterally along a mounting surface of said overhanging boundary, said strip being positioned to maintain a first mounting edge of said screen against said mounting surface;

at least one fastening member constructed and arranged to secure said strip to said overhanging boundary;

said second anchoring means includes at least one fastening member adapted to link said second mounting edge of said screen with said underlying boundary when said screen is in said use orientation;

a support means for adjustably positioning said screen second mounting edge with respect to said underlying boundary, said support means includes at least one pulley for mounting on said overhanging boundary;

and at least one corresponding flexible member operatively associated with said pulley, said flexible member having a first end for attachment to said overhanging boundary and a free second end, said first and second ends being spaced apart by a middle portion, said middle portion adjustably supporting said pole,

whereby when said second end is pulled with respect to said pulley, said middle portion travels about said pulley, thereby producing vertical motion of said pole and said screen second mounting edge.

* * * * *

# EXHIBIT "D"

## McHALE & SLAVIN, P.A.

ATTORNEYS AT LAW

U.S. & INTERNATIONAL PATENTS, TRADEMARKS, COPYRIGHTS,
RELATED LICENSING & LITIGATION

2855 PGA BOULEVARD
PALM BEACH GARDENS • FLORIDA • 33410-2910
TELEPHONE (561) 625-6575     FACSIMILE (561) 625-6572
palmbeach@mspatents.com

March 30, 2005

Certified Mail
Return Receipt Requested

Attn:  Brian Rist & Steve Johnson
Storm Catcher Inc.
11850 Plantation Rd.
Suite A
Ft. Meyers, FL 33912

Re:     Infringement Notice
        US Patent No. 6,865,852 and 6,325,085
        Our Ref. No. 1789.00

Gentlemen:

We are legal counsel for Targus International, Inc. (Targus). Targus is the owner of the above-referenced United States patents. Claims of the '852 and claim 10 of the '085 patent, attached, cover the use of a flexible mesh protective barrier for maintaining the integrity of structure, such as the type of protective barrier your company is currently advertising, promoting, selling and/or distributing in the United States.

In light of the claims covered by the above-referenced patent, we have advised our client that the manufacture, promotion, sale and/or distribution of your protective barrier constitutes infringement of the above-referenced patents. Additionally, those acting in concert with you, ie. supplier(s) and distributor(s) of these products would also be engaged in infringing activities, as direct infringers or as contributory infringers.

As you know, patent infringement is a serious matter and those found to infringe a United States patent can be liable to the patent owner for both actual and treble damages, lost profits, court costs, and attorneys' fees. Additionally, infringers are also subject to injunction orders barring their manufacture and sale of infringing products.

We are hereby placing you on formal notice of your infringing activities and hereby formally demand that you cease and desist such infringing activities. Although our client is not prepared to excuse you from the damages which may have already been caused by your infringing activities due to past sales, your failure to promptly heed this letter, and our demand that you immediately cease and desist such infringing activities, will only serve to increase your legal exposure to damages which may result from infringement litigation.

Our client is prepared to discuss with you arrangements pursuant to which you may be able to avoid exposure of patent litigation, but we must have your prompt acknowledgment of this letter and your favorable response to our client's demand that you cease and desist any infringing activity within ten (10) days of your receipt of this letter. Otherwise, our client is prepared to assert all of its legal rights against you.

GOVERN YOURSELF ACCORDINGLY,

McHALE & SLAVIN, P.A.

Michael A. Slavin

MAS/nl
enclosure
cc: Targus International Company
\\Ns2\SERVER\CLIENT FILES\1700-1799\1789 - Armor Screen\1789L_000000 Litigation\CORRESPONDENCE\Storm Catcher.wpd

# EXHIBIT "E"

# ARMOR SCREEN CORPORATION
## INDEPENDENT   DEALER - PROTECTIVE AGREEMENT

This Agreement is made as of the 23 day of August 2001, between ARMOR SCREEN CORPORATION, having a principal place of business located at 2001-A North Congress Avenue, Riviera Beach, FL 33404 and Tropical StormShield, Inc. an individual/corporation residing in/doing business at 1748 Independence Blvd. ("Dealer"). Sarasota, FL 34234

ARMOR SCREEN wishes to engage the services of Dealer as an independent Dealer of ARMOR SCREEN flexible wind abatement hurricane products and Dealer wishes to provide such services for ARMOR SCREEN. In order to enable Dealer to carry out its duties under this Agreement, ARMOR SCREEN will disclose trade secrets and/or certain confidential information about ARMOR SCREEN's business, customers and suppliers to Dealer. Protection of ARMOR SCREEN's trade secrets, confidential information, good-will and relationships with customers and suppliers is essential to the ongoing operation of ARMOR SCREEN's business and its ability to compete in the marketplace. ARMOR SCREEN and Dealer desire by this Agreement to provide for the protection of ARMOR SCREEN's business, confidential information, good-will and relationships. Therefore, ARMOR SCREEN hereby engages Dealer and Dealer hereby accepts such engagement, according to the following terms and conditions:

1. Confidential Information. Dealer may have access to certain confidential information, including, but not limited to, know-how, inventions, processes, technology, trade secrets, customer lists and the like, concerning the business, customers, suppliers and relationships of ARMOR SCREEN which are not generally known outside ARMOR SCREEN ("Confidential Information"). Dealer agrees that it shall not, without prior written consent of ARMOR SCREEN, directly or indirectly, use, divulge or make accessible to any person any Confidential Information, or use said Confidential Information to take undue advantage of ARMOR SCREEN. Confidential Information shall not include any of the above information which has become public other than through a breach of this Agreement. The following information shall not be considered Confidential Information:

a. information in the public domain at the time of disclosure to the Dealer by ARMOR SCREEN;

b. information which, after disclosure to the Dealer, becomes a part of the public domain by dissemination by a third party and other than by an act or omission of the Dealer;

c. information which the Dealer can demonstrate by documentary evidence to have been in his possession at the time of disclosure to Dealer, and not acquired directly or indirectly from ARMOR SCREEN; and

d. information which is subsequently disclosed or made available to Dealer without an obligation of confidence by a third party having a bona fide right to disclose or make available such information.

2. ARMOR SCREEN Property. Upon completion or termination of Dealer's relationship with ARMOR SCREEN, for whatever reason, Dealer shall return to ARMOR SCREEN all records, files, drawings, documents, equipment, and copies thereof which relate to the ARMOR SCREEN business. Neither during nor after Dealer's association with ARMOR SCREEN shall such property be furnished by Dealer to any third party without ARMOR SCREEN's authorization.

3. Non-Competition. During the term of this Agreement, Dealer shall not divert any business opportunities from ARMOR SCREEN or engage, directly or indirectly, in any business which sells flexible wind abatement systems or otherwise competes with ARMOR SCREEN's flexible wind abatement systems. For twenty four (24) months after the term of this Agreement ends, for whatever reason, Dealer shall not, without written permission from Corporation, directly or indirectly, engage in the manufacturing, sale or distribution of flexible wind abatement systems.

4. Non-Solicitation. During the term of Dealer's association with ARMOR SCREEN, and for twenty four (24) months thereafter, Dealer shall not, without written permission from ARMOR SCREEN solicit any customer of ARMOR SCREEN's with whom he/she worked as a Dealer for ARMOR SCREEN to do business with any business which competes with ARMOR SCREEN; or solicit any ARMOR SCREEN

employee to leave ARMOR SCREEN and enter employment with any business that competes with ARMOR SCREEN.

5. **Relationship Between Parties.** Dealer is retained by ARMOR SCREEN only for the purposes and to the extent set forth in this Agreement, and Dealer's relationship to ARMOR SCREEN shall, during the period or periods of Dealer's services hereunder, be that of an independent Dealer. Dealer shall be free to dispose of such portion of his entire time, energy, and skill during regular business hours as he is not obligated to devote hereunder to the Corporation, in such manner as he sees fit and to such persons, firms, or corporations who are not competitors of Corporation. Dealer shall not be considered as having an employee status or as being entitled to participate in any plans, arrangements, or distributions by ARMOR SCREEN or its subsidiary companies pertaining to or in connection with any pension, stock, bonus, profit-sharing, salary, expenses or similar benefits for their regular employees.

6. **Indemnity.** Dealer hereby agrees to indemnify and hold ARMOR SCREEN harmless for any and all claims arising from Dealer's negligence, bad workmanship or installation failures.

7. **Legal Compliance.** Dealer shall comply with any and all local, city, county, state and federal laws and regulations pertaining to the handling of employees, facilities and equipment and is responsible for keeping abreast of such laws and regulations.

8. **Irreparable Harm.** Dealer acknowledges that his compliance with this Agreement is necessary to preserve and protect the business, good-will, confidential information and relationships of ARMOR SCREEN and that any failure by Dealer to comply with the provisions of this Agreement will result in irreparable and continuing injury to ARMOR SCREEN for which there will be no adequate remedy at law. Dealer agrees that if he fails to comply with this Agreement, ARMOR SCREEN shall be entitled, in addition to such other relief as may be proper, to whatever equitable relief may be necessary to restore property to ARMOR SCREEN or otherwise make ARMOR SCREEN whole.

9. **Enforceability.** If any provision of this Agreement is held invalid or unenforceable, then such provision shall be deemed to be modified to the extent and in the manner necessary to render it valid and enforceable, or shall be deemed stricken from this Agreement. This Agreement shall be construed and enforced to the maximum extent permitted by law. No waiver of a violation of this Agreement shall constitute waiver of the Agreement.

10. **Miscellaneous.** Any amendment to this Agreement must be made in writing and signed by the Dealer and by an authorized officer of ARMOR SCREEN. All rights and obligations of ARMOR SCREEN under this Agreement shall inure to the benefit of, and be binding upon, its successors and assigns. This Agreement is not assignable by the Dealer.

11. **Governing Law.** This Agreement shall be governed by the laws of the State of Florida and suit may be brought in the State of Florida, and shall have no time limit. Recipient acknowledges that the information is highly confidential and that the unauthorized disclosure of same might cause irrevocable harm to the disclosing party, and that accordingly, the disclosing party shall be entitled to injunctive relief to enforce the confidentiality of said information.

DEALER

BY: _Kathleen Johnson_

Title: _Owner Sec._

ARMOR SCREEN CORPORATION

BY: _Ron Brennan_

TITLE: _Executive V.P._

C:\FILES\ARC\1AC-prop\armorscreen.wpd

# EXHIBIT "F"



## ARMOR SCREEN CORPORATION
### INDEPENDENT DEALER - PROTECTIVE AGREEMENT

This Agreement is made as of the 18th day of July 2001, between **ARMOR SCREEN CORPORATION**, having a principal place of business located at 2001-A North Congress Avenue, Rivera Beach, FL 33404 and **21ˢᵗ CENTURY SCREENS, INC.**, an individual/corporation residing in/doing business at 1599 S.W. 30ᵀᴴ Avenue, Boynton Beach, FL 33426 ("Dealer").

ARMOR SCREEN wishes to engage the services of Dealer as an independent Dealer of ARMOR SCREEN flexible wind abatement hurricane products and Dealer wishes to provide such services for ARMOR SCREEN. In order to enable Dealer to carry out its duties under this Agreement, ARMOR SCREEN will disclose trade secrets and/or certain confidential information about ARMOR SCREEN's business, customers and suppliers to Dealer. Protection of ARMOR SCREEN's trade secrets, confidential information, good-will and relationships with customers and suppliers is essential to the ongoing operation of ARMOR SCREEN's business and its ability to compete in the marketplace. ARMOR SCREEN and Dealer desire by this Agreement to provide for the protection of ARMOR SCREEN's business, confidential information, good-will and relationships. Therefore, ARMOR SCREEN hereby engages Dealer and Dealer hereby accepts such engagement, according to the following terms and conditions:

1. <u>Confidential Information</u>. Dealer may have access to certain confidential information, including, but not limited to, know-how, inventions, processes, technology, trade secrets, customer lists and the like, concerning the business, customers, suppliers and relationships of ARMOR SCREEN which are not generally known outside ARMOR SCREEN ("Confidential Information"). Dealer agrees that it shall not, without prior written consent of ARMOR SCREEN, directly or indirectly, use, divulge or make accessible to any person any Confidential Information, or use said Confidential Information to take undue advantage of ARMOR SCREEN. Confidential Information shall not include any of the above information which has become public other than through a breach of this Agreement. The following information shall not be considered Confidential Information:

   a. information in the public domain at the time of disclosure to the Dealer by ARMOR SCREEN;

   b. information which, after disclosure to the Dealer, becomes a part of the public domain by dissemination by a third party and other than by an act or omission of the Dealer;

c. information which the Dealer can demonstrate by documentary evidence to have been in his possession at the time of disclosure to Dealer, and not acquired directly or indirectly from ARMOR SCREEN; and

d. information which is subsequently disclosed or made available to Dealer without an obligation of confidence by a third party having a bona fide right to disclose or make available such information.

2. <u>ARMOR SCREEN Property</u>. Upon completion or termination of Dealer's relationship with ARMOR SCREEN, for whatever reason, Dealer shall return to ARMOR SCREEN all records, files, drawings, documents, equipment, and copies thereof which relate to the ARMOR SCREEN business. Neither during nor after Dealer's association with ARMOR SCREEN shall such property be furnished by Dealer to any third party without ARMOR SCREEN's authorization.

3. <u>Non-Competition</u>. During the term of this Agreement, Dealer shall not divert any business opportunities from ARMOR SCREEN or engage, directly or indirectly, in any business which sells flexible wind abatement systems or otherwise competes with ARMOR SCREEN's flexible wind abatement systems. For twenty four (24) months after the term of this Agreement ends, for whatever reason, Dealer shall not, without written permission from Corporation, directly or indirectly, engage in the manufacturing, ~~sale or distibution~~ of flexible wind abatement systems. 

4. <u>Non-Solicitation</u>. During the term of Dealer's association with ARMOR SCREEN, and for twenty four (24) months thereafter, Dealer shall not, without written permission from ARMOR SCREEN solicit any customer of ARMOR SCREEN's with whom he/she worked as a Dealer for ARMOR SCREEN to do business with any business which competes with ARMOR SCREEN; or solicit any ARMOR SCREEN employee to leave ARMOR SCREEN and enter employment with any business that competes with ARMOR SCREEN.

5. <u>Relationship Between Parties</u>. Dealer is retained by ARMOR SCREEN only for the purposes and to the extent set forth in this Agreement, and Dealer's relationship to ARMOR SCREEN shall, during the period or periods of Dealer's services hereunder, be that of an independent Dealer. Dealer shall be free to dispose of such portion of his entire time, energy, and skill during regular business hours as he is not obligated to devote hereunder to the Corporation, in such manner as he sees fit and to such persons, firms, or corporations who are not competitors of Corporation. Dealer shall not be considered as having an employee status or as being entitled to participate in any plans, arrangements, or distributions by ARMOR SCREEN or its subsidiary companies pertaining to or in connection with any pension, stock, bonus, profit-sharing, salary, expenses or similar benefits for their regular employees.

6. <u>Indemnity</u>.  Dealer hereby agrees to indemnify and hold ARMOR SCREEN harmless for any and all claims arising from Dealer's negligence, bad workmanship or installation failures.

7.  <u>Legal Compliance</u>.  Dealer shall comply with any and all local, city, county, state and federal laws and regulations pertaining to the handling of employees, facilities and equipment and is responsibile for keeping abreast of such laws and regulations.

8.  <u>Irreparable Harm</u>.  Dealer acknowledges that his compliance with this Agreement is necessary to preserve and protect the business, good-will, confidential information and relationships of ARMOR SCREEN and that any failure by Dealer to comply with the provisions of this Agreement will result in irreparable and continuing injury to ARMOR SCREEN for which there will be no adequate remedy at law.  Dealer agrees that if he fails to comply with this Agreement, ARMOR SCREEN shall be entitled, in addition to such other relief as may be proper, to whatever equitable relief may be necessary to restore property to ARMOR SCREEN or otherwise make ARMOR SCREEN whole.

9.  <u>Enforceability</u>.  If any provision of this Agreement is held invalid or unenforceable, then such provision shall be deemed to be modified to the extent and in the manner necessary to render it valid and enforceable, or shall be deemed stricken from this Agreement. This Agreement shall be construed and enforced to the maximum extent permitted by law.  No waiver of a violation of this Agreement shall constitute waiver of the Agreement.

10.  <u>Miscellaneous</u>.  Any amendment to this Agreement must be made in writing and signed by the Dealer and by an authorized officer of ARMOR SCREEN. All rights and obligations of ARMOR SCREEN under this Agreement shall inure to the benefit of, and be binding upon, its successors and assigns. This Agreement is not assignable by the Dealer.

11.  <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Florida and suit may be brought in the State of Florida, and shall have no time limit. Recipient acknowledges that the information is highly confidential and that the unauthorized disclosure of same might cause irrevocable harm to the disclosing party, and that accordingly, the disclosing party shall be entitled to injunctive relief to enforce the confidentiality of said information.

**21st CENTURY SCREENS, INC.**          **ARMOR SCREEN CORPORATION**

BY: _____          BY: _____
        Wes Fraser                                    Ron Brennan
                                                      TED BOWER   PRESIDENT

TITLE: PRESIDENT                          TITLE:    Executive Vice President

DATE: 11/27/01                            DATE:    4/13/01

# EXHIBIT "G"

3 26 02



# DEALER AGREEMENT #1020

This Agreement is effective as of April 1, 2002, between **SAVANNAH TRIMS, INC.** with its principal place of business at **5601 Corporate Way, Suite 108, West Palm Beach, FL 33407** (the "Dealer") and **ARMOR SCREEN CORPORATION**, a Florida corporation ("Company").

Company desires to sell and install wind abatement/impact protection systems through dealers, resellers, direct sales to potential customers and through other channels of distribution as Company may develop from time to time. The Dealer desires to sell and install the ARMOR SCREEN™ flexible wind abatement/impact protection system.

Based on the mutual benefits and agreements herein, the parties agree as follows:

## 1.    RELATIONSHIP OF THE PARTIES

### 1.1    Authorization.

**1.1.1** Company hereby authorizes Dealer and Dealer hereby agrees to offer, obtain orders for, and install the Company's ARMOR SCREEN™ flexible wind abatement/impact protection system subject to the terms and conditions contained herein and subject to all Policies and Procedures that may be issued by Company from time to time.

**1.1.2** Company specifically reserves the right to restrict Dealer from selling ARMOR SCREEN™ flexible wind abatement/impact protection system to certain specifically enumerated customers or to certain classes of customers, and by certain methods, including without limitation, the Internet. All of these restrictions will be defined in the Policies and Procedures issued by Company from time to time. The parties recognize, understand and agree that said restrictions are necessary to ensure proper servicing of customers.

**1.1.3** Dealer will not commence any telemarketing effort to solicit customers from the general or commercial public unless approved in writing by Company before Dealer's telemarketing effort begins.

### 1.2    Nature of Relationship.

In all dealings within the scope of this Agreement, the parties acknowledge and agree that the relationship created by this Agreement is that of independent contracting parties and is not, and will not be deemed to be, any other relationship, including, without limitation, that of joint ventures, joint employers, or a partnership. Dealer is not a

© Armor Screen Corporation 2002                    1                    Initials

3 26.02

general agent of Company, and the relationship does not constitute an agency coupled with an interest. When conducting business under this Agreement, Dealer must identify itself as an Authorized Dealer of the Company. Dealer has not paid and will not be required to pay any franchise fee or other fee to be a dealer for Company or to use Company's name or other intellectual property. This Agreement does not create any franchise between the parties.

**1.3     No Other Agreements.**   Dealer represents and warrants to Company that the execution and performance of this Agreement does not and will not violate any other contract or obligation to which Dealer is a party, including terms relating to covenants not to compete and confidentiality covenants. Dealer will not disclose to Company, or use or induce Company to use, any proprietary information or trade secrets of any other person, association or entity. Dealer represents and warrants that it has returned all property and confidential information belonging to all prior employers or providers for whom Dealer may have acted as a dealer.

**1.4     Solicitation**

**1.4.1**  Upon Dealer's completion of all training required by Company regarding ARMOR SCREEN™ flexible wind abatement/impact protection system and of signing Company's Guidelines, Company hereby authorizes Dealer, and Dealer hereby is eligible to offer and obtain orders for sale and installment of ARMOR SCREEN™ flexible wind abatement/impact protection system through all of Dealer's outlets in the area.
**1.4.2**  Company may terminate this Agreement or Dealer's right to sell ARMOR SCREEN™ flexible wind abatement/impact protection system immediately upon written notice to Dealer in the event that Dealer engages in any activities prohibited by law or prohibited by this agreement with respect to ARMOR SCREEN™ flexible wind abatement/impact protection system.

**1.5     Promotional Literature.**  Company will provide at a price to be set by Armor Screen Corporation from time to time, during the term of this Agreement.

**2.     DUTIES AND RESPONSIBILITIES OF DEALER**

**2.1     General**.  Dealer must faithfully, honestly and diligently perform its obligations under this Agreement, and must use its best efforts to promote ARMOR SCREEN™ flexible wind abatement/impact protection system. Dealer is to promote both the product itself and the brand and name ARMOR SCREEN™.  Dealer will take no action inconsistent with the provisions of this Agreement and must support the Company's efforts in providing ARMOR SCREEN™ flexible wind abatement/impact protection system service to customers.  Dealer must provide timely, courteous and efficient service to customers and must be governed in all dealings with members of the public and with the Company by the highest standards of honesty, integrity, ethical conduct and fair dealing.
**2.2     Confidentiality.**
**2.2.1**  Dealer acknowledges that it may be in receipt of certain confidential proprietary information relating to the Company, including without limitation, lists of customers,

financial and business information, including commission structures, technical information and other information not generally known to the public relating to the Company, including the terms of this Agreement (collectively, "Confidential Information").   Dealer acknowledges that any Confidential Information of the Company that has been disclosed to Dealer has been disclosed solely for the performance of its duties under this Agreement.  Dealer agrees that all Confidential Information of the Company is the exclusive property of the Company. Dealer further acknowledges that the disclosure or improper use of such Confidential Information would irreparably injure the Company and that Company's Confidential Information is a trade secret of Company.

**2.2.2**  Dealer agrees that, during and after the term of this Agreement, neither Dealer, nor any employee, affiliate, or other person or entity otherwise connected with Dealer, may directly or indirectly, without the prior written consent of Company, divulge, use, sell, exchange, give away or transfer any Company Confidential Information.  Dealer further agrees that it will advise its employees of these restrictions and will use reasonable efforts to prevent the disclosure or the improper use of Confidential Information by any current or former employees.

**2.2.3**  If Dealer is served with any form of process to obtain any Confidential Information of Company; the Dealer must immediately notify Company, which has the right to seek to quash such process.

**2.2.4**  Parties agree that they may have signed an "Independent Dealer-Protective Agreement" and that if in conflict with the within agreement, the terms of said agreement govern said conflict and the balance of this agreement shall remain in force..

### 2.3   Solicitation and Installation

**2.3.1**  Dealer must solicit customers strictly in accordance with the Policies and Procedures as will be issued by Company from time to time.  Dealer may be responsible for selling a minimum number of units if set forth in the Policies and Procedures.  Dealer must maintain in stock Company's current brochures and other materials required in the Policies and Procedures.

**2.3.2**  Dealer will assist Company's efforts to prevent fraudulent or abusive use of Company's products and will comply with all fraud prevention Policies and Procedures issued by Company from time to time.

**2.3.3**  Dealer must provide adequate training for its salespersons and installers regarding the sales and installation of ARMOR SCREEN™ flexible wind abatement/impact protection system and offer the product only through trained salespersons operating from the Dealer approved locations.

**2.3.4**  All installations must meet the requirements of applicable state and local building codes.

## 3.   WARRANTY

**3.1   Manufacturer's Warranty.**  ARMOR SCREEN™ systems offer a Manufacturer's Limited Warranty of (10) ten years pro rated on replacement of product.  No warranty is provided on the survivability of any structure. A copy of the Limited Warranty Statement accompanies each unit and is the only warranty, except for warranty of title. Dealer must make the Limited Warranty statement readily available to Dealer's customer and purchasers prior to sale.  Any warranty

© Armor Screen 2002

3

Initials

representations made by Dealer which are in addition to the representations in the Limited Warranty statement must apply against Dealer only and any costs, administrative, legal or otherwise connected with any additional warranty statements must be borne by Dealer. Dealer must indemnify and hold Company harmless from all direct and indirect results and consequences flowing from such statements.

## 4.   PAYMENT OF PRODUCT

**4.1**     The Company will provide the ARMOR SCREEN™ flexible wind abatement system to the Dealer at a price established by schedule, which is subject to change without notice. Payment shall be as advised by Armor Screen from time to time.

## 5.   DEALER'S OPERATING MATTERS

**5.1     Dealer's Business Records.** Dealer must create and maintain at its locations, and preserve for the period 3 years from the date of their preparations, full, complete, and accurate records of its business conducted pursuant to this Agreement.

**5.2     Compliance with Laws and Policies and Procedures.**

**5.2.1**  Dealer must comply with: (1) all laws and regulations, tariffs, and any rules of other governmental bodies applicable to Dealer's business, (2) all Policies and Procedures concerning the conduct of Dealer's business relating to ARMOR SCREEN™ flexible wind abatement/impact protection system reasonably prescribed from time to time by the Company, which Policies and Procedures are incorporated by reference in this Agreement in their entirety.

**5.2.2**  Dealer's failure to comply with any of these Policies and Procedures will constitute a material breach of this Agreement and may subject Dealer to monetary penalties, forfeiture of Dealer's right to sell company products or other sanctions in accordance with the Policies and Procedures. The Company will send written notice to Dealer of any new Policies and Procedures issued by the Company, or of any changes to existing Policies and Procedures.

**5.3     Insurance.** Dealer must at all times during the term hereof, at Dealer's sole expense, be insured by a reputable insurance company licensed to do business in the states where Dealer operates under this Agreement under a comprehensive general liability insurance policy with reasonable coverage limits. The Company will be named as an additional insured on said policy. Proof of coverage shall be provided to the Company.

## 6.   USE OF MARKS BY DEALER; PROTECTION OF THE COMPANY'S RIGHTS

**6.1     Use of Marks.** During the term of this Agreement, the Company authorizes Dealer to be an Authorized Dealer of Company and to use its trademarks, service marks, trade names, logos, or similar markings that the Company owns or is licensed to use subject to the limitations contained herein. Dealer acknowledges that all Marks are the exclusive property of Company. Dealer must indicate that Company is the manufacturer of ARMOR SCREEN™ flexible, protective wind abatement system in its advertising, and may utilize the Marks in its advertising as long as Dealer complies with all Policies and Procedures pertaining to this use prescribed by Company from time to time. Dealer will not use the Marks for any other purpose without the express prior written consent of Company.

**6.2     No Transfer of Rights.** Dealer acknowledges that this Agreement does not transfer any rights to use any Marks (except to the limited extent set forth herein and during the term and

© Armor Screen 2002

4

Initials

any extensions hereof) and that this Agreement does not and will not confer any goodwill or other interest in any Marks upon Dealer, all rights to which remain with the Company. Dealer will not challenge Company's ownership of the Marks in any way.

**6.3    Unauthorized Use.** Any unauthorized use of the Marks by Dealer or its respective employees, affiliates, or subagents constitutes infringement of Company's rights and a material breach of this Agreement. Upon expiration or termination of this Agreement for any reason, Dealer must immediately discontinue use of the Marks.

**6.4    No Disparagement.** Dealer must not in any way disparage Company's products and all use of Company's Marks by Dealer must not injure or diminish the goodwill associated with Company's Marks.

## 7.    TERM

This Agreement commences on its effective date and will continue for a period of one year and at the end of each year shall automatically renew unless otherwise terminated as provided in this Agreement. Either party to the agreement may terminate this agreement on 30 days written notice to the other at the address provided herein.

## 8.    TERMINATION OR EXPIRATION OF AGREEMENT

**8.1    Termination for Cause.** Subject to the provisions contained in Section 8.2, either party may terminate this Agreement by written notice to the other party if the other party breaches any material term or condition of this Agreement, and Company may terminate this Agreement if Dealer fails to comply with any Policies or Procedures reasonably required and reasonably applied by the Company. Either party may terminate this Agreement immediately upon written notice to the other party if any regulatory agency promulgates any rule, regulation, or order which in effect or application prohibits or substantially impedes the Company from fulfilling its obligations under this Agreement or prohibits or substantially impedes Dealer's ability to sell ARMOR SCREEN™ flexible, protective wind abatement system or if the other party becomes financially insolvent or if Dealer is found to have made a material misrepresentation to Company during the application process to become a Dealer, or if Dealer is found to have engaged in fraudulent or illegal conduct. This Agreement will terminate immediately and without notice if either party:  makes an assignment for the benefit of creditors; has an Order for Relief under Title 11 of the United States Code entered by any United States Court against it; or has a trustee or receiver of any substantial part of its assets appointed by any court.

**8.2    Breach and Cure Period.** Neither party will be in breach of this Agreement unless the other party provides written notice to the allegedly breaching party of any violation of this Agreement and the allegedly breaching party fails to cure such violation within 30 days after receiving this notice. If the default is not cured by the end of the 30-day period, then termination will be effective without further notice. Notwithstanding the above, **a breach by Dealer of any part of Sections 2 or 6 of this Agreement is not subject to cure** and, accordingly, any such breach gives Company the right to terminate the Agreement immediately upon written notice to Dealer.

**8.3    Obligations of Dealer Upon Termination or Expiration.** Upon the expiration or

termination of this Agreement for any reason. Dealer and its affiliates must: (a) discontinue the use of all Marks, such as signs, logos, stationary, or business cards, and must return to Company all materials containing any Mark or otherwise identifying or relating to Company's business; (b) cease representing themselves in any fashion as a Dealer or representative of Company; (c) return to Company or destroy those documents, records or other materials (including, without limitation, all copies, either photocopies or computer copies), which were provided to Dealer by Company or which contain any Confidential Information of Company; and (d) not solicit, directly or indirectly any of Company's Customers to terminate their relationship with Company for one year, in accordance with section 2.3 of this Agreement.

## 9.   ADVERTISING

Dealer will conform to the highest ethical standards for advertising, take all reasonable steps to make sure that its advertising materials with respect to Company's Service are factually correct, comply with all applicable laws and correctly use Company Marks. Dealer is to use its best efforts to promote the brand and product.

## 10.   DISPUTES

**10.1   Notification and limitation of Actions.** Dealer must notify Company in writing of any grievance or dispute it may have regarding the Agreement or its relationship with Company within 120 days of the date Dealer became aware, or reasonably should have become aware of the grievance or dispute. If the Dealer fails to notify Company of the grievance or dispute within that 120 day period, then Company will not be liable to Dealer for any loss of injury relating to that grievance or dispute.

### 10.2   Arbitration of Disputes.

**10.2.1 Arbitration Clause.** Except as stated in Section 11.2.4 of this Agreement, all claims (including counterclaims and cross-claims) and disputes between Dealer and Company must be resolved by submission to binding arbitration. (Dealer is not entitled to seek injunctive relief against Company.) The parties must submit any such disputes to the office of the (American Arbitration Association ["AAA"]) nearest to Dealer within the Area, to be decided under the then current AAA commercial arbitration rules.

**10.2.2 Limitations of Actions.** All claims and disputes covered by this Section 11 must be submitted to arbitration by initiating the arbitration not later than 180 days after the act or omission giving rise to the claim or dispute occurred, except for the failure to pay invoices for products purchased by Dealer from Company. The failure to initiate arbitration within the period constitutes an absolute bar to the institution of any proceedings based on such act or omission. The aggrieved party must initiate arbitration under this Section 11 by sending written notice of an intention to arbitrate to all parties. The notice must contain a description of the dispute, the amount involved, and the remedy sought.

**10.2.3 Procedures and Discovery.** The arbitrator must schedule a prehearing conference to reach agreement on procedural matters, arrange for the exchange of information, obtain stipulations, schedule the arbitration hearing, and attempt to narrow the issues. In order to expedite the arbitration proceedings, the parties have agreed to place the following limitations on discovery:

**(i)**     Each party may propound only (one interrogatory) requesting the names and addresses of the witnesses to be called at the arbitration hearing;

© Armor Screen 2002

6

Initials

(ii)     On a date to be determined at the prehearing conference, each party may serve one request for the production of documents. The documents are to be exchanged 21 days after service of the request; and

(iii)    Each party may depose 4 witnesses. Each deposition must be concluded within four hours and all depositions must be taken within 60 days of the prehearing conference. Any party deposing an opponent's expert witness must pay the expert's fee for preparation and attendance at the deposition.

(iv)    Following the pre-hearing conference, but prior to the arbitration hearing, the parties shall submit all pending issues to mediation before a Certified Mediator.

**10.2.4 Company's Right to Seek Injunction**.   Notwithstanding anything in this Section 11, Company may bring court proceedings to seek an injunction or other equitable relief to enforce any right, duty or obligation under this Agreement. To obtain injunctive or other equitable relief, Company is not required to post a bond or, if required by law or by the court, the Dealer hereby consents to a bond in the lowest amount permitted by law.

**10.2.5 Enforcement of Award**.    Neither party has the right to appeal the decision of the arbitrator.  The award of the arbitrator may be confirmed or enforced in any court having jurisdiction.

**10.2.6 Attorney's Fees**.     If either party commences any arbitration or court action, the substantially prevailing party in that action is entitled to recover its out-of-pocket and court costs and reasonable attorneys fee incurred therein.   Neither party may be considered the substantial prevailing party unless the arbitration award is more favorable to said party than any written settlement proposal made on or before the tenth day following mediation.

**10.2.7 Individual Responsibility**.  Personnel employed by, or acting under the authority of, parties to this Agreement are not employees or agents of the other party, and the first party assumes full responsibility for their acts and has sole responsibility for their supervision and control.

## 11.   MISCELLANEOUS

**11.1    Governing Law.** Except to the extent governed by federal laws or regulations, the substantive laws of the State of Florida govern the entire relationship of the parties based on this Agreement, without reference to its choice of law rules.  Venue for any and all legal proceedings arising from this agreement is agreed to be in Palm Beach County, Florida.

**11.2    Waivers.** The rights of the parties under this Agreement, including the Policies and Procedures, are cumulative and not exclusive of any other rights and remedies.  The waiver by any party of any right under this Agreement, or any breach hereof does not constitute a waiver of any other right or remedy on a future occasion.

**11.3    Force Majeure.** Neither party is liable for loss or damage or will be in breach of this Agreement if its failure to perform its obligations results from:  (1) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof or any court of competent jurisdiction; (2) acts or omissions of the other party in violation of this Agreement; or (3) acts of God, fires, strikes, embargoes, war, insurrection, riot, and other causes beyond the reasonable control of the party.  Any delay resulting from any of these causes extends performance accordingly or excuses performance, in whole or in part, as may be reasonable.

Initials

**11.4   Entire Agreement.** This Agreement, including all Policies and Procedures issued under it, represents the entire agreement of the parties with respect to the subject matter hereof. There are not other oral or written understandings or agreements between the Company and Dealer relating to the subject matter hereof, and this Agreement supersedes all prior negotiations, communications, agreements and addenda between the parties hereto with respect to the subject matter hereof, except that post-termination covenants including covenants of non-competition, and confidential information from prior agreements are not superseded.   Nothing in this Agreement is intended or should be deemed to confer any rights or remedies upon any entity not a party hereto.

**11.5   Modification.** This Agreement may only be amended or superseded by written agreement executed by authorized representatives of both parties, except as otherwise explicitly stated in this Agreement. Each such modification will be effective only in the specific instance for the specific purpose for which given. No course of dealing or usage of trade may be invoked to modify the terms and conditions of this Agreement. No other understandings or representations, whether oral or in writing, will amend or supersede this Agreement.

**11.6   Assignability.** Neither party may assign this Agreement or any of its obligations hereunder without the other party's prior written consent, except that Company may assign its rights hereunder to any affiliate or to any other entity or person related to Company by any merger, transfer of assets, consolidation or takeover in which Company is involved.   Any assignment by Dealer in violation of this section, including, without limitation, any material change in control or ownership of Dealer's entity, renders this Agreement immediately void, and conveys no rights or interest.

**11.7   Survivability.** Upon termination of this Agreement, all rights and duties of the parties terminate, except the following survive: Dealers duties under sections 2.2, 2.3, 5 and sections, 6, 11, and 12 of this Agreement. The parties must cooperate to fulfill all surviving obligations in a timely manner.

**11.8   Acknowledgments.** *The Company and Dealer acknowledge that they have read this Agreement and understand and accept the terms, conditions and covenants for contained herein as being reasonably necessary to maintain the Company's high standards for products for Service and thereby to protect and preserve the goodwill of the Company's products and its Marks. Dealer acknowledges and understands that Company may at any time compete directly with Dealer in the soliciting of customers for in the sale, lease, installation, repair or warranty servicing of ARMOR SCREEN™ flexible, protective wind abatement system and may also appoint other Dealers and others to offer or sell ARMOR SCREEN™ flexible, protective wind abatement system and related equipment. Dealer has independently investigated the business outlined in this Agreement and the profitability (if any) and risks, and is not relying on any representation, guarantee, or statement of Company other than as set forth in this Agreement.*

*Dealer acknowledges that Company has not represented:  (a) Dealer's prospects or chances for success selling products under this Agreement; (b) the total investment that Dealer may need to make to operate under this Agreement (Company does not know the amount of investment required for this purpose); or (c) that Company will limit its efforts to sell service or establish other dealers.*

© Armor Screen 2002

8

Initials

*Dealer also acknowledges that Company has not represented to Dealer that: (a) Dealer will derive income from the sale of Company's services under this Agreement, or Company will refund any payments made by Dealer to Company under this Agreement or repurchase any of the products or equipment supplied by Company to Dealer; or (b) Company will provide a sales or marketing program that will enable dealer to derive income under this Agreement.*

**11.9   Indemnification.**  Dealer and the Company hereby agree to defend and hold the other party, its affiliates and employees harmless for all liability, damages, punitive damages, expenses, including reasonable attorneys' fees and disbursements, claims, demands or suits arising from their negligent, willful, or fraudulent acts, or for their failure to act, with respect to the performance of each parties' obligations under this Agreement and all Policies and Procedures, including, without limitation, any allegedly unauthorized use of a trademark, patent, copyright, process, idea, method or device covered by this Agreement, or bodily injury or damage to property to the extent occasioned by the acts or omissions of the indemnifying party or its affiliates, employees, or subcontractors.  Prompt written notice must be provided to the indemnifying party of any claim for indemnification.  Each party may conduct its own defense of any claim in which it is named as a defendant without diminishing its indemnity rights.  Each party is only responsible for any losses or damages proximately caused by it. The Limitation of Liability clause in paragraph 12.11 does not limit recovery under this Indemnification clause.

**11.10  Severability.**  A determination by a court or arbitrator of competent jurisdiction that any provision of this Agreement or any part thereof is unenforceable will not cancel or invalidate the remainder of such provision or this Agreement, which will remain in full force and effect and will be construed to carry out the intent of the parties.

**11.11  Limitation of Liability.**  EXCEPT UNDER THE INDEMNIFICATION CLAUSE, NEITHER COMPANY NOR DEALER IS LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, AS A RESULT OF ANY DEFAULT OR BREACH OF THIS AGREEMENT OR THE TERMINATION OR NON-RENEWAL OF THIS AGREEMENT OR ANY OTHER EVENT, CONDUCT, ACT OR OMISSION ARISING OUT OF OR RELATED TO THIS AGREEMENT WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE. THIS LIMITATION OF LIABILITY IS MADE KNOWINGLY, INTENTIONALLY AND VOLUNTARILY.

## 12.   NOTICES

All notices, requests, demands, and other communications hereunder must be in writing and must be deemed given if personally delivered or mailed, certified mail, return receipt requested, or sent by nationally recognized overnight carrier to the following address:

    (1)   If to Dealer:     SAVANNAH TRIMS, INC.
                                     5601 Corporate Way, Suite 108
                                     West Palm Beach, FL 33407

    (2)   If to Company:   ARMOR SCREEN CORPORATION
                                     2001-A North Congress Avenue
                                   Riviera Beach, FL 33404

© Armor Screen 2002

Initials _____

Notwithstanding the foregoing, Company may notify Dealer of changes in Policies and Procedures, compensation, or other business notices by first class mail, nationally recognized overnight carrier, electronic mail, facsimile, or by in-hand delivery.

The parties have executed this Agreement by their duly authorized representatives effective as of the date first above written.

**DEALER:**

**SAVANNAH TRIMS, INC.**

*[signature]* 5-31-02

**COMPANY:**

**ARMOR SCREEN CORPORATION** ON ITS OWN BEHALF AND ON BEHALF OF ITS FLORIDA AFFILIATES.

By: *[signature]*

Ted Gower:   President

Date: 7/19/02

© Armor Screen 2002

10

Initials *[initials]*

# Appendices

## A. Armor Screen™ Terms & Conditions

In accordance with the most current "Manufacturer Wholesale Pricing" sheet.
All prices subject to change without notice.
Payment shall be as advised from Armor Screen Corp. from time to time

## B. Armor Screen TM Sales Guidelines

➢ All sales people selling the Armor Screen TM product should have successfully completed the Armor Screen College Sales Training Program.
➢ should only use Armor Screen Corporation approved sales collateral material.
➢ follow the Armor Screen approved methods and forms for the writing and submission of a sales order.
➢ sign and date every document that they give to the Armor Screen Corporation.
➢ only and always refer to their company as an authorized dealer of Armor Screen TM products.

## C. Armor Screen Corporation Installation Rules

➢ Only installers authorized by the dealer may install the product.
➢ Armor Screen reserves the right to spot check installations of the Armor Screen Corporation .

## D. Armor Screen Corporation Marketing Rules- 2/1/2000

➢ The dealer must always identify themselves in all marketing communication, programs and media as an authorized dealer of the Armor Screen TM Product
➢ All uses of the Armor Screen name must always include the trademark symbol.
➢ The dealer may not alter or change the trademarked logo or name in any way.
➢ Armor Screen Corporation before its use may require it approve all marketing communication that includes Armor Screen ™ and is not supplied by the Armor Screen Corporation.
➢ The dealer holding the agreement must use the approved wording when describing the attributes and benefits of the Armor Screen Corporation products and services
➢ All marketing collateral used by the dealer but not supplied by Armor Screen and including the Armor Screen product or Armor Screen must approve logo before its use.

## E. Dealer Eligibility Requirements- 2/2/2000

➢ Dealer must always follow and be in compliance with all components of this agreement.
➢ Dealer must be financially solvent. Armor Screen reserves the right to receive evidence of solvency from the dealer upon demand.
➢ Dealer and it's principles must not have any criminal history or pending lawsuits against them.
➢ Dealer must have his or her own sales force.
➢ Dealer must have his or her own installation force and be able to fully complete jobs including licensing, permitting and any other necessary legalities.
➢ Dealer must adhere to the entire appropriate Armor Screen methods and procedures when delivering the Armor Screen product.

I have read the above appendices in their entirety and agree to them

Initials   _____

© Armor Screen 2002

Initials

# EXHIBIT "H"




**Savannah Trims inc.**

3567 91 street North, Suite # 4,  Lake Park, FL 33403.   Ph: 561-656-2556  FX 656-2599

# PROPOSAL

To:   Anna Rhodes

Ph... phone fax   832-6564

**DATE:**      3-22-06

**PROJECT :**  hurricane screens
2666 Park Ave. Riviera Beach

We are pleased to provide you with pricing for your project.  This proposal is based upon the supply and installation of custom Hurricane Screens by Storm Catcher, using standard design and applications.

We propose to furnish a total of 56 screens for the windows and doors, and mounted with head tracks as required. Quotation to include installation, all attachment fasteners   Quote is predicated upon an impact tested and certified unit to the Florida Building code for large missile impact.

## For the sum of $ 25,600.00  tax included

Terms: 50% with Order, 25% at time of shipment, balance upon completion.

1.  Quotation based upon manufacturers specification and accessories.
2.  Manufacturers warranties all pass directly to customer or end user.
3.  NO permits or fees are included. Includes all insurances
4.  For permitting and  fees ADD $1,500.00

NOTE: THIS PROPOSAL MAY BE WITHDRAWN WITH NO LIABILITY TO SAVANNAH TRIMS INC. ITS PRINCIPALS OR ITS AGENTS IF THE BUYERS PURCHASE ORDER, CONTRACT, SUBCONTRACTS TERMS AND/OR CONDITIONS ARE NOT MUTUALLY ACCEPTABLE.

ACCEPTED: _____

BY: _____
2006 _____

TITLE _____

DATE: _____

THIS QUOTATION FIRM FOR _____60_____ DAYS

BY: ___ Dennis Dodock March 28. ___

TITLE _____

DATE: _____

Terms and conditions on the reverse are binding on this agreement.

# "CONDITIONS OF SALE"

The Addressee is hereinafter to as the Purchaser and Savannah Trims Incorporated as the Seller unless noted.

1. **ACCEPTANCE AND CLERICAL ERRORS:** This proposal is rendered for prompt acceptance and is void unless accepted by the Purchaser within 30 days from date hereof unless extended in writing by the Seller. It is subject to subsequent correction in case of clerical error.

2. **CREDITS:** Seller reserves the right to reject acceptance of this order because of matters of credit or other conditions not satisfactory to it.

3. **DELAYS:** Seller shall not be liable for any other damages, delays or [illegible] of work caused by strikes, lockouts, embargoes, riots, fires, floods, windows, other acts of God, accidents, war, governmental interference and any other causes beyond Seller's control. Delays in processing this order due to causes beyond the Seller's control, or because of delays on the part of the Purchaser, which results in increased labor and [or] material costs shall be subject to regulations [or] adjustments to reflect such increased costs. Time of completion shall be extended by such amount of time as shall have been lost by these delays.

4. **BACKCHARGES:** No back charges of any nature will be accepted by the Seller without prior authorization in writing from Seller.

5. **STORAGE SPACE:** If erection of materials is included in this contract, Purchaser agrees to provide safe and adequate storage area for such materials, both before and during installation at no expense to the Seller. Purchaser agrees to be responsible for damages to the Seller's materials, when such damage is caused by others than those employed by the Seller during the progress of the job.

6. **SHOP DRAWINGS:** Shop drawings prepared by the Seller and approved by the architect and the Purchaser shall be deemed to be the correct interpretation of the work to be performed and work will commence only upon approval of such shop drawings.

7. **PREPARATIONS:** The Purchaser agrees to fully prepare and make ready, in advance of installation, all job areas, surfaces and openings in order to permit continuous uninterrupted installation work.

8. **INSURANCE:** Seller agrees to carry Workmen's Compensation Insurance in compliance with the Workmen's Compensation Law of the state in which the work is performed. Seller also agrees to carry Public Liability Insurance in limits of $1,000,000.00 / $2,000,000.00 for Bodily Injury and $200,000.00 / $500,000.00 for Property damage. Any additional coverage that may be required will be for the account of the Purchaser.

9. **TAXES:** This proposal does not include any Federal, State or Municipal sales or use tax, unless so stated in this proposal.

10. **WORK NOT INCLUDED:** This proposal does not include furnishing or installing of any structural steel, flashing, glass, caulking, or masking, or any items such as shimming of masses, changes of opening, cutting of holes for other trades. Furnishing of contractors or labor necessary to correct the [illegible] of others, [illegible] or providing special shoring [illegible] or protecting our work and/or any of the [illegible] of materials unless specifically called for in this proposal. The Seller will assume no liability for specific or problem charges for items such as general cleaning, general office expenses, decomposition, watchmen, temporary structures, noise, heat, light or use of telephone. Any work listed on plumbing, heating, venting, and electrical damage of specified under these respective specification divisions are not included, unless specifically called out on the architectural drawings or in the architectural specification.

11. **OVERTIME:** All work is to be performed during Seller's regular working hours, and if any overtime work is requested by the Purchaser such work shall be paid for by the Purchaser at the increased cost of this labor, including [illegible], overhead and profit.

12. **CLAIMS:** Claims for errors cannot be considered unless made promptly upon receipt of goods. Purchaser shall immediately check and inspect all materials on their arrival and if found improper, short or damaged shall immediately file claim with the carrier. If any other defect, shortage or improper quality of material is disclosed, Purchaser shall give written notice to Seller within two days from receipt of materials from carrier. Seller shall then have the option of repairing or replacing any such materials for which he might be responsible. Failure to give notice shall constitute waiver of any claim on this account.

13. **BONDS:** If surety of Performance Bonds are required to be furnished by the Seller, cost of such shall be borne by the Purchaser.

14. **TOOLS, JIGS, FIXTURES:** Tools, jigs, and fixtures shall remain the property of the seller unless initially furnished by the Purchaser.

15. **CANCELLATION:** Cancellation of this contract in its entirety or as to any part not performed, if desired by the Purchaser and approved by the Seller will provide payment pro-rated for work done, and for material in process or delivered. Such payment will include full selling expense, overhead, material or service payments, permits and fees, and anticipated profit.

16. **CONFLICT:** Conflict between contract documents on which our bid is based and any State or Local Municipal Law or ordinance shall not be the responsibility of the Seller and he shall not suffer any loss as a result of such conflict.

17. **FIELD MEASUREMENTS:** This proposal does not include any field measurements. All material and labor will be in accordance with the approved shop drawings of the Seller, and the Purchaser shall coordinate the work of all trades involved.

18. **MATERIAL OWNERSHIP:** Ownership of materials delivered shall remain with the Seller until [illegible] payments have been made and received by the Seller. The Seller reserves the right to recover any [illegible] materials by the Seller if any [illegible] payments become overdue. If payments are not made and received per contract, the Seller, unilaterally or [illegible], may remove the [illegible] materials until such payments are made. Any additional expense incurred by the Seller by such action will be the responsibility of the Purchaser and shall be paid to the Seller by the Purchaser.

19. **ARBITRATION:** Any disagreement between the Seller and the Purchaser as to the intent of this contract, at the request of either, shall be presented for arbitration in accordance with the requirements set forth by the American Institute of Architects, or the American Arbitration Association.

20. **ACCEPTANCE:** This proposal, if accepted, must be approved by an officer of the Seller before becoming binding upon the Seller, and its terms, provisions, force and effect shall be construed and determined according to the law of the State of Florida.

21. **CHANGES OR EXTRA WORK:** The Seller shall not be obligated to proceed with any changes or extra work without obtaining an order in writing specifying the agreed price for such work. In the absence of a written order for changes or extra work, the Purchaser shall pay the Seller on or before thirty days after completion of such changes or extra work, a sum equivalent to the cost of all labor, material, overhead and profit.

22. **CONTRACT DOCUMENTS:** The clauses herein set forth shall take precedence over any condition provision contained in any plans, specifications, or other contract documents.

# Savannah Trims, Inc.



3557 91st Street North, Suite 4
Lake Park, Florida 33403

www.SAVANNAHTRIMS.com

Telephone 561-656-2535
Fax 561-656-2598

## Partial List of Skylight Credits

| | | | |
|---|---|---|---|
| JM Toyota Headquarters<br>Deerfield Beach, FL | Norton Art Gallery<br>West Palm Beach, FL | F P & L Headquarters<br>Juno Beach, FL | Miles Grant Country Club<br>Stuart, FL |
| PGA Spa & Health Resort<br>Palm Beach Gardens, FL | Lagorce Palace<br>Miami Beach, FL | Ritz Carlton Di Lido<br>Miami, FL | Lois Pope Health Center<br>Miami, FL |
| Disney's Broadway Resort<br>Lake Buena Vista, FL | Marina Gallery Of Art<br>Miami Beach, FL | Ocean One<br>North Miami Beach, FL | Trust Estate<br>Palm Beach, FL |
| 1st Data Merchant Services<br>Boca Raton, FL | Village Properties<br>Boca Raton, FL | 2000 Williams Island<br>Miami, FL | Palm Beach Day School<br>Palm Beach, FL |
| Summerfield Suites<br>Miami, FL | Surfcomber Hotel<br>Miami Beach, FL | Emcom Headquarters<br>Chistiansted, St. Croix | Rush Limbaugh Res.<br>Palm Beach, FL |
| St. Andrews School<br>Boca Raton, FL | Boca Del Mar County<br>Boca Raton, FL | Days Inn<br>Miami Beach, FL | Oakbrook Square<br>North Palm Beach, FL |
| Mariners Village<br>Aventura, FL | Southern Waste Treat<br>Boynton Beach, FL | Jet Aviation Corp Office<br>West Palm Beach, FL | Cunningham Residence<br>Palm Beach, FL |
| Miami Sunset SHS<br>Miami, FL | Gloria Floyd Elem School<br>Miami, FL | Naval Air Station<br>Key West, FL | Kimmel Residence<br>Palm Beach, FL |
| Silver Lake Resort<br>Orlando, FL | Volusia Medical Center<br>Orlando, FL | South Miami Hospital<br>Miami, FL | Gosman Estate<br>Palm Beach, FL |
| Presidential Tower<br>Hollywood, FL | School of the Arts<br>Riviera Beach, FL | Casa Bonita<br>Delray Beach, FL | Gerald Taal Residence<br>Palm Beach, FL |
| Community Savings<br>Jupiter, FL | Leesburg Health Center<br>Leesburg, FL | Seigel Residence<br>Boca Raton, FL | Villa Piel<br>Palm Beach, FL |
| Tri County Rail Station<br>Hialeah, FL | Miami Edison School<br>Miami, FL | Union County HS<br>Gainsville, FL | Great House<br>North Palm Beach, FL |
| Palm Bedach Medical Grp<br>West Palm Beach, FL | Avatar Community Ctr<br>Orlando, FL | Derby Lake Park<br>Fla Dept of Recreation | Gerrard Residence<br>Manalapan, FL |
| Master Mausoleum<br>Boca Raton, FL | Woodfield Country Club<br>Boca Raton, FL | Isles of Hunter Run<br>Boca Raton, FL | Potampkin Residence<br>Coral Gables, FL |
| Salvation Army<br>West Palm Beach, FL | Lake Point II<br>Tampa, FL | Hospital Materno<br>Dominican Republic | Harris Residence<br>Palm Beach, FL |
| Palm Beach Gov't Center<br>West Palm Beach, FL | 4600 East Park Road<br>North Palm Beach, FL | Montgomery Residence<br>Weston, FL | Casperson Residence<br>West Palm Beach, FL |
| P.B Community Collage<br>Lake worth, FL | Woodfield Hunt Club<br>Boca Raton, FL | University of South Florida<br>Tampa, FL | Westside Hospital<br>Sunrise, FL |

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

TARGUS INTERNATIONAL CO. and ARMOR SCREEN

**(b)** County of Residence of First Listed Plaintiff   PALM BEACH
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Edward F. McHale, Esq., McHale & Slavin, P.A., 2855 PGA Blvd.,
Palm Beach Gardens, FL 33410 (561) 625-6575

Palm Beach DC - 80303 KLR/ASL

**(d)** Check County Where Action Arose   ☐ MIAMI-DADE   ☐ MONROE   ☐ BROWARD   ☒ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE HIGHLANDS

**DEFENDANTS**

STORM CATCHER, et al.

06 - 80303

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

CIV

Attorneys (If Known)

FELDMAN GALE, 201 SO. BISCAYNE BLVD., MIAMI, FL

KLR/ASL

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

MAGISTRATE
VITUNAC

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

NIGHT BOX

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Med. Malpractice | ☐ 625 Drug Related Seizure | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 365 Personal Injury - | of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☒ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | Liability / Injury Product Liability | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page)   a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE                          DOCKET NUMBER

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

35 U.S.C. Section 271

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $   CHECK YES only if demanded in complaint   JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD         DATE   3/31/2

FOR OFFICE USE ONLY
AMOUNT ___ RECEIPT #   937838

04/03/06